**Alan R. KAHN, as custodian for Amanda Kahn and Kimberly Kahn, Plaintiff Below, Appellant,**

v.

**LYNCH COMMUNICATION SYSTEMS, INC., Compagnie Generale d'Electricite, Alcatel, S.A., Alcatel USA Corp., Frank M. Drendel, Raymond Hono, Francois H. de Laage de Meux, John Gailey and Gilles DuPay-d'Ageac, Defendants Below, Appellees.**

No. 169, 1995.

Supreme Court of Delaware.

Submitted: Sept. 6, 1995.

Decided: Nov. 22, 1995.

---

Victor F. Battaglia and Robert D. Goldberg, Biggs and Battaglia, Wilmington, and Joan T. Harnes (argued), Silverman, Harnes & Harnes, New York City, for Appellant.

Allen M. Terrell, Jr. (argued), and John T. Dorsey, Richards, Layton & Finger, Wilmington, for Appellees.

Before WALSH, HOLLAND, and HARTNETT, Justices.

WALSH, Justice:

This is the second appeal in this shareholder litigation after a Court of Chancery ruling in favor of the defendants. The underlying dispute arises from a cash-out merger of Lynch Communications System, Inc. ("Lynch") into a subsidiary of Alcatel USA, Inc. ("Alcatel"). In the previous appeal, this Court determined that Alcatel, as a controlling shareholder of Lynch, dominated the merger negotiations despite the fact that Lynch's board of directors had appointed an independent negotiating committee. *Kahn v. Lynch Communication Systems, Inc.*, Del. Supr., 638 A.2d 1110, 1112–13 (1994) (*"Lynch I"*). We concluded, however, that such a determination did not necessarily preclude a finding that the transaction was entirely fair and remanded the matter to the Court of Chancery for a determination of entire fairness, with the burden of proof upon the defendants.

Upon remand, the Court of Chancery re-evaluated the record under the appropriate burden of proof and concluded that the transaction was entirely fair to the Lynch minority shareholders. The court also rejected plaintiff's claim that the defendants violated their duty of disclosure in failing to describe specifically the threat of a lower priced tender offer. We affirm in both respects.

I

The facts underlying the derivative claims are set forth extensively in *Lynch I* and we summarize them briefly for present purposes.

Lynch, a Delaware corporation, designed and manufactured electronic telecommunications equipment, primarily for sale to telephone operating companies. Alcatel, a holding company, is a subsidiary of Alcatel (S.A.), a French company involved in public telecommunications, business communications, electronics, and optronics. Alcatel (S.A.), in turn, is a subsidiary of Compagnie Generale d'Electricite ("CGE"), a French corporation with operations in energy, transportation, telecommunications and business systems.

In 1981, Alcatel[1] acquired 30.6% of Lynch's common stock pursuant to a stock purchase agreement. As part of that agreement, Lynch amended its certificate of incorporation to require an 80% affirmative vote to approve any business combination. By the time of the events leading to the contested merger, Alcatel owned 43.3% of Lynch's outstanding stock and designated five of the eleven directors on Lynch's board of directors, two of the three members of the executive committee, and two of the four members of the compensation committee.

In the spring of 1986, Lynch determined that it needed to acquire fiber optics technology in order to remain competitive. Lynch management identified a target company, Telco Systems, Inc. ("Telco"), that had the needed technology. Telco was apparently amenable to acquisition by Lynch. Lynch had to obtain Alcatel's consent, however, since the supermajority voting provision gave Alcatel an effective veto over any business combination. Exercising this power, Alcatel vetoed the transaction and instead proposed a combination of Lynch and Celwave Systems, Inc. ("Celwave"), an indirect subsidiary of CGE that possessed fibre optics technology. Ellsworth F. Dertinger ("Dertinger"), chairman of the board and CEO of Lynch, stated that Celwave would not be of interest to Lynch if Celwave were not owned by Alcatel. Nevertheless, the Lynch Board

unanimously adopted a resolution that established a committee of independent directors (the "Independent Committee") to negotiate with Celwave and recommend the terms and conditions on which a combination would be based.

On October 24, 1986, Alcatel's investment banking firm, Dillon, Read & Co., Inc. ("Dillon, Read") made a presentation to the Independent Committee in which it explained the benefits of a Lynch/Celwave combination and proposed a stock-for-stock merger. The Independent Committee's investment advisors reviewed the Dillon, Read report and placed a significantly lower value on Celwave than had Dillon, Read. Consequently, the Independent Committee decided that the proposal was unattractive to Lynch and made a recommendation against the Lynch/Celwave combination.

Reacting to the Independent Committee's recommendation, Alcatel withdrew the Celwave proposal and instead offered to acquire the Lynch shares it did not already own at $14 cash per share. In response, at its November 7th board meeting, the Lynch directors revised the mandate of the Independent Committee and authorized the same directors to negotiate the cash merger offer with Alcatel. Meeting on the same day, the Independent Committee decided that $14 per share was inadequate.

On November 12, the Independent Committee made a counteroffer of $17 per share. The parties negotiated for approximately two weeks, during which time Alcatel's highest offer was $15.50 per share. On November 24, 1986, the Independent Committee met with its financial and legal advisors and were informed by one of the committee members that Alcatel was "ready to proceed with an unfriendly tender at a lower price" if the $15.50 offer was not accepted. The Independent Committee, after consulting with its financial and legal advisors, voted unanimously to recommend that the Lynch board approve Alcatel's $15.50 cash per share merger. The Lynch board met later that day and, with Alcatel's nominees abstaining, approved the merger.

---

1. "Alcatel" refers to Alcatel and its affiliates.

Kahn, a Lynch shareholder, brought suit, later certified as a class action, challenging Alcatel's acquisition of Lynch through a tender offer and cash-out merger. Kahn alleged the merger to be unfair in that Alcatel, as a controlling shareholder, breached its fiduciary duties to Lynch's minority shareholders. Specifically, Kahn charged that Alcatel dictated the terms of the merger; made false, misleading, and inadequate disclosures; and paid an unfair price.

In its initial ruling, the Court of Chancery agreed with Kahn in finding that Alcatel exercised control over Lynch, but rejected the claim that Alcatel's disclosures in connection with the merger were insufficient. *Kahn v. Lynch Communication Systems, Inc.*, Del.Ch., C.A. No. 8748, 1993 WL 290193 slip op. at 5, 18, Berger, V.C. (July 9, 1993) (the "1993 decision"). Since Alcatel had negotiated with Lynch through an Independent Committee, however, the court placed the burden of disproving entire fairness on the plaintiff. In its evaluation of the evidence, the court concluded that Kahn had not carried his burden of demonstrating that the price was unfair and thus failed to prove a breach of fiduciary duty on the part of Alcatel. Judgment was accordingly entered for the defendants and Kahn appealed.

On appeal, this Court agreed with the Court of Chancery that Alcatel was a controlling shareholder. *Lynch I*, 638 A.2d at 1114–15. Since Alcatel had vetoed Lynch's acquisition of Telco and dominated Lynch's board on other occasions, the Court of Chancery's finding was clearly supported by the record. *Id.*

This Court then turned to the finding that the transaction was entirely fair. We noted that normally a controlling shareholder, such as Alcatel, bears the burden of proving the entire fairness of a transaction in the context of a parent-subsidiary merger. *Id.* at 1115. *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710 (1983), requires that the party that has the burden of showing entire fairness must address that concept's "two basic aspects: fair dealing and fair price." *Weinberger* also addressed the question of what type of evidence would constitute a showing of entire fairness, and indicated that proce-

dures, such as an independent negotiating committee which approximated an arm's length bargaining process is strong evidence of fairness. 457 A.2d at 709–10 n. 7.

The question remained, however, of the weight to be accorded such evidence, or, more specifically, whether a procedure approximating arm's length bargaining shifts the burden to the plaintiffs to show entire fairness or changes the standard of review so that the transaction will be examined under the business judgment rule. In *Lynch I* we noted that, since *Weinberger*, a business purpose has not been required to justify a merger. 638 A.2d at 1116. Therefore, since no business judgment need be exercised, the business judgment rule is not the proper standard of review. *Id.* "Consequently, in a merger between the corporation and its controlling stockholder—even one negotiated by disinterested, independent directors—no court could be certain whether the transaction terms fully approximate what truly independent parties would have achieved in an arm's length negotiation." *Citron v. E.I. Du Pont de Nemours & Co.*, Del.Ch., 584 A.2d 490, 502 (1990). Accordingly, the transaction must be examined for its entire fairness "because the unchanging nature of the underlying 'interested' transaction requires careful scrutiny." 638 A.2d at 1116.

The next issue addressed by this Court in *Lynch I* was the allocation of the burden of proof. In order to shift the burden of showing entire fairness to the plaintiffs, the Independent Committee's negotiations must have resulted in something approaching arm's length negotiations. When undertaking this evaluation "[p]articular consideration must be given to evidence of whether the special committee was truly independent, fully informed, and had the freedom to negotiate at arm's length." *Lynch I*, 638 A.2d at 1120–21. We noted with approval an earlier Court of Chancery ruling to the effect that at least two factors are required for this type of negotiation: (1) "the majority shareholder did not dictate the terms of the merger," and (2) the committee had real bargaining power so that it could negotiate with the controlling shareholder at arm's length. *Rabkin v. Olin Corp.*, Del.Ch., C.A. No. 7547 (Consolidated),

Chandler, V.C., 1990 WL 47648, slip op. at 14–15 (Apr. 17, 1990), *reprinted in* 16 Del. J.Corp.L. 851, 861–62 (1991), *aff'd,* Del.Supr., 586 A.2d 1202 (1990).

Without explicitly referring to the *Rabkin* test, the Court of Chancery in the 1993 decision found that it had been satisfied to the extent the Independent Committee had appropriately simulated an arm's length transaction. However, in *Lynch I,* this Court found that determination to be unsupported by the record. 638 A.2d at 1121. Alcatel's threat of a hostile bid prevented the negotiations from approximating an arm's length transaction. *Id.* The Independent Committee had, in effect, surrendered to the ultimatum delivered with Alcatel's last offer. *Id.* Alcatel's use of its disproportionate bargaining power destroyed any approximation to being at arm's length the negotiations otherwise may have had. We therefore held that the Court of Chancery had improperly allocated the burden of proof to the plaintiff. *Id.* at 1112.

Consequently, the case was remanded for a "redetermination of the entire fairness of the cash-out merger to Kahn and the other Lynch minority shareholders with the burden of proof remaining on Alcatel, the dominant and interested shareholder." *Id.* at 1122; *see Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 367 (1993), *on reargument,* 636 A.2d 956 (1994) ("*Cede II* "). Revisiting its decision based solely on the existing record and in light of this Court's instructions, the Court of Chancery preliminarily, and correctly, noted that "the Supreme Court did not intend to foreclose a finding of entire fairness on remand." *Kahn v. Lynch Communication Systems, Inc.,* Del. Ch., C.A. No. 8748, 1995 WL 301403, slip. op. at 3, Berger, J. (April 17, 1995) (the "1995 decision"). "[T]he absence of certain elements of fair dealing does not mandate a decision that the transaction was not entirely fair." *Id.* at 3–4; *accord Cinerama, Inc. v. Technicolor, Inc.,* Del.Supr., 663 A.2d 1156, 1179 (1995).

After examining the transaction for entire fairness, the Court of Chancery once again found for the defendants, holding that they had carried the burden of showing the entire fairness of the transaction. *See Cinerama, Inc. v. Technicolor, Inc.,* Del.Ch., 663 A.2d 1134, 1144 (1994). The Court of Chancery rejected the plaintiff's claim that the coercion of the Independent Committee should have been disclosed to the shareholders. In addition, despite this coercion, the defendants were deemed to have met their burden of fair dealing because they had satisfied other relevant factors set forth in *Weinberger.* 1995 decision, slip op. at 3–5 (citing *Weinberger,* 457 A.2d at 711). Specifically, the court examined the transaction's timing, initiation, structure and negotiation.

Next, the Court of Chancery examined the issue of fair price. Finding the evaluation of the plaintiffs' expert flawed, the court concluded that the defendants had also met their burden of establishing the fairness of the price received by the stockholders. 1995 decision, slip op. at 5–6. Thus, the Court of Chancery held for the defendants after finding that they had established the entire fairness of the transaction. *Accord Cinerama, Inc. v. Technicolor, Inc.,* Del.Ch., 663 A.2d 1134, 1144 (1994).

In this appeal from the 1995 decision of the Court of Chancery, Kahn raises several issues. First, he contends that the finding of fair dealing was inconsistent with our opinion in *Lynch I* and unsupported by the record. Specifically, Kahn asserts that the coercion of the Independent Committee constituted a *per se* breach of fiduciary duty which strongly compels a finding that the transaction was not entirely fair. In addition, the plaintiff charges that the initiation, timing and negotiation of the merger were unfair and also require a finding of unfair dealing.

Second, the plaintiff contends that Alcatel breached its fiduciary duty to Lynch's stockholders by not fully disclosing its conduct in negotiating the merger. Thus, according to the plaintiff, the Court of Chancery erred by not finding a breach of the duty of disclosure. Such a finding, it is argued, is itself proof of unfair dealing.

The third claim made by Kahn is a challenge to the determination that the stockholders received a fair price for their shares. Kahn insists that the evidence submitted by

Alcatel did not sustain their burden of showing that the price was fair.

## II

■ Although we address this matter a second time following a partial reversal and remand, the standard of appellate review of the Court of Chancery's second decision is the same. To the extent that the Court of Chancery made supplemental factual findings, we will defer to those findings unless they are clearly erroneous or not arrived at through a logical process. *Cede & Co. v. Technicolor, Inc.,* Del.Supr., 634 A.2d 345, 360 (1993); *Lynch I,* 638 A.2d at 1114. Our review of the formulation and application of legal principles, however, is plenary and requires no deference. *Gilbert v. El Paso Co.,* Del.Supr., 575 A.2d 1131, 1142 (1990).

### A.

At the outset we must confront the disagreement between the parties concerning the extent to which our decision in *Lynch I* limited the scope of the Court of Chancery's re-examination of the record on remand. Kahn argues that this Court's characterization of Alcatel's conduct as "coercive" was not accorded adequate consideration by the trial court in its entire fairness calculation. Alcatel contends to the contrary that this Court's evaluation of the record in *Lynch I* was done in the context of determining which party had the burden of proving entire fairness and that the Court of Chancery, on remand, was restricted procedurally, but not substantively, in its view of the trial evidence.

■ While we agree that our decision in *Lynch I* limited the range of findings available to the Court of Chancery upon remand, our previous review of the record focused upon the threshold question of burden of proof. Our reversal on burden of proof left open the question whether the transaction was entirely fair. *Lynch I,* 638 A.2d at 1122. Indeed, Kahn concedes that our ruling on burden shifting did not create *per se* liability, an obvious concession since we did not address the fair price element in *Lynch I,* except to note that the Independent Committee's ability to negotiate price had been com-

promised by Alcatel's threat to proceed with a hostile tender offer. *See Cinerama, Inc. v. Technicolor, Inc.,* Del.Supr., 663 A.2d 1156, 1162 (1995). The Court of Chancery correctly took as its premise on remand that Alcatel, as the dominant and interested shareholder bore the burden of demonstrating the entire fairness of the merger transaction. Its findings will be tested from that perspective.

As we noted in *Lynch I,* "a controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness" 638 A.2d at 1115. The standard for demonstrating entire fairness is the oft-repeated one announced in *Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 711 (1983): fair dealing and fair price. Fair dealing addresses the timing and structure of negotiations as well as the method of approval of the transaction, while fair price relates to all the factors which affect the value of the stock of the merged company. *Id.* An important teaching of *Weinberger,* however, is that the test is not bifurcated or compartmentalized but one requiring an examination of all aspects of the transaction to gain a sense of whether the deal in its entirety is fair. *Id.* In its most recent authoritative analysis of the subject, this Court held: "the board will have to demonstrate entire fairness by presenting evidence of the cumulative manner by which it ... discharged all of its fiduciary duties." *Cinerama, Inc. v. Technicolor, Inc.,* Del.Supr., 663 A.2d at 1163.

### B.

This Court will now review the Court of Chancery's entire fairness analysis upon remand. *Accord Cinerama, Inc. v. Technicolor, Inc.,* Del.Supr., 663 A.2d at 1172. The record reflects that the Court of Chancery followed this Court's mandate by applying a unified approach to its entire fairness examination. *Lynch I,* 638 A.2d at 1115. In doing so, the Court of Chancery properly considered "how the board of directors discharged all of its fiduciary duties with regard to each aspect of the non-bifurcated components of entire fairness: fair dealing and fair price."

*Cinerama, Inc. v. Technicolor, Inc.,* Del. Supr., 663 A.2d at 1172.

■ In addressing the fair dealing component of the transaction, the Court of Chancery determined that the initiation and timing of the transactions were responsive to Lynch's needs. This conclusion was based on the fact that Lynch's marketing strategy was handicapped by the lack of a fiber optic technology. Alcatel proposed the merger with Celwave to remedy this competitive weakness, but Lynch management and the non-Alcatel directors did not believe this combination would be beneficial to Lynch. Dertinger, Lynch's CEO, suggested to Alcatel that, under the circumstances, a cash merger with Alcatel will be preferable to a Celwave merger. Thus, the Alcatel offer to acquire the minority interests in Lynch was viewed as an alternative to the disfavored Celwave transaction.

Kahn argues that the Telco acquisition, which Lynch management strongly supported, was vetoed by Alcatel to force Lynch to accept Celwave as a merger partner or agree to a cash out merger with Alcatel. The benefits of the Telco transaction, however, are clearly debatable. Telco was not profitable and had a limited fiber optic capability. There is no assurance that Lynch's shareholders would have benefitted from the acquisition. More to the point, the timing of a merger transaction cannot be viewed solely from the perspective of the acquired entity. A majority shareholder is naturally motivated by economic self-interest in initiating a transaction. Otherwise, there is no reason to do it. Thus, mere initiation by the acquirer is not reprehensible so long as the controlling shareholder does not gain a financial advantage at the expense of the minority. *Cinerama, Inc. v. Technicolor, Inc.,* Del.Supr., 663 A.2d 1156, 1172 (1995); *Jedwab v. MGM Grand Hotels, Inc.,* Del.Ch., 509 A.2d 584, 599 (1986).

In support of its claim of coercion, Kahn contends that Alcatel timed its merger offer, with a thinly-veiled threat of using its controlling position to force the result, to take advantage of the opportunity to buy Lynch on the cheap. As will be discussed at greater length in our fair price analysis, *infra,*

Lynch was experiencing a difficult and rapidly changing competitive situation. Its current financial results reflected that fact. Although its stock was trading at low levels, this may simply have been a reflection of its competitive problems. Alcatel is not to be faulted for taking advantage of the objective reality of Lynch's financial situation. Thus, the mere fact that the transaction was initiated at Alcatel's discretion, does not dictate a finding of unfairness in the absence of a determination that the minority shareholders of Lynch were harmed by the timing. The Court of Chancery rejected such a claim and we agree.

### C.

With respect to the negotiations and structure of the transaction, the Court of Chancery, while acknowledging that the Court in *Lynch I* found the negotiations coercive, commented that the negotiations "certainly were no less fair than if there had been no negotiations at all." 1995 decision, slip op. at 4. The court noted that a committee of non-Alcatel directors negotiated an increase in price from $14 per share to $15.50. The committee also retained two investment banking firms who were well acquainted with Lynch's prospects based on their work on the Celwave proposal. Moreover, the committee had the benefit of outside legal counsel.

It is true that the committee and the Board agreed to a price which at least one member of the committee later opined was not a fair price. *Lynch I,* 638 A.2d at 1118. But there is no requirement of unanimity in such matters either at the Independent Committee level or by the Board. A finding of unfair dealing based on lack of unanimity could discourage the use of special committees in majority dominated cash-out mergers. Here Alcatel could have presented a merger offer directly to the Lynch Board, which it controlled, and received a quick approval. Had it done so, of course, it would have born the burden of demonstrating entire fairness in the event the transaction was later questioned. *See Weinberger v. UOP,* Del.Supr., 457 A.2d 701 (1983). Where, ultimately, it has been required to assume the same burden, it should fare no worse in a judicial

review of the fairness of its negotiations with the Independent Committee.

Kahn asserts that the Court of Chancery did not properly consider our finding of coercion in *Lynch I*. Generally, as in this case, the burden rests on the party that engaged in coercive conduct to demonstrate the equity of their actions. *Lynch I*, 638 A.2d at 1121; *Unitrin, Inc. v. American General Corp.*, Del.Supr., 651 A.2d 1361, 1373, 1387 (1995) (holding that burden rests on board of directors which has taken draconian, e.g., coercive, measures in response to hostile tender offer). Kahn challenges the Court of Chancery's finding of fair dealing by relying upon the holding in *Ivanhoe Partners v. Newmont Min. Corp.*, Del.Ch., 533 A.2d 585, 605–06 (1987), *aff'd*, Del.Supr., 535 A.2d 1334 (1988), for the proposition that coercion creates liability *per se*.[2] *Ivanhoe* makes clear, however, that to be actionable, the coercive conduct directed at selling shareholders must be a "material" influence on the decision to sell. *Id.; see also Eisenberg v. Chicago Milwaukee Corp.*, Del.Ch., 537 A.2d 1051, 1061–62 (1987).

Where other economic forces are at work and more likely produced the decision to sell, as the Court of Chancery determined here, the specter of coercion may not be deemed material with respect to the transaction as a whole, and will not prevent a finding of entire fairness. In this case, no shareholder was treated differently in the transaction from any other shareholder nor subjected to a two-tiered or squeeze-out treatment. *See, e.g., Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946, 956 (1985). Alcatel offered cash for all the minority shares and paid cash for all shares tendered. Clearly there was no coercion exerted which was material to this aspect of the transaction, and thus no finding of *per se* liability is required.

## D.

As previously noted, in *Lynch I* this Court did not address the fair price aspect of the merger transaction since our remand required a reexamination of fair dealing at the trial level. The parties had presented extensive evidence at the original trial concerning the value of Lynch. Upon remand the Court of Chancery reassessed that evidence with the burden on Alcatel to prove the fairness of the cash-out merger price. *Accord Cinerama, Inc. v. Technicolor, Inc.*, Del.Ch., 663 A.2d 1134, 1142–44 (1994).

In considering whether Alcatel had discharged its burden with respect to fairness of price, the Court of Chancery placed reliance upon the testimony of Michael McCarty, a senior officer at Dillon Read, who prepared Alcatel's proposal to the Independent Committee. He valued Lynch at $15.50 to $16.00 per share—a range determined by using the closing market price of $11 per share of October 17, 1988 and adding a merger premium of 41 to 46%. Dillon Read's valuation had been prepared in October, 1986 in connection with the Lynch/Celwave combination proposed at a time when Lynch was experiencing a downward trend in earnings and prospects. Subsequent to the October valuation, Lynch management revised its three year forecast downward to reflect disappointing third quarter results.

The Court of Chancery also considered the valuation reports issued by both Kidder Peabody and Thompson McKinmon who were retained by the Independent Committee at the time of the Celwave proposal in October. At that time both bankers valued Lynch at $16.50 to $17.50 per share. These valuations, however, were made in response to Alcatel's Celwave proposal and were not, strictly speaking, fairness opinions. When Lynch later revised downward its financial forecasts based on poor third quarter operating results

---

**2.** The plaintiffs in *Ivanhoe* were vying for control of Newmont Mining Corp. and challenged a street sweep undertaken by a competitor for control, Consolidated Gold Fields PLC and its subsidiaries. This Court upheld the *Ivanhoe* trial court's determination that the street sweep, which was undertaken in cooperation with the target's management, did not constitute coercion. However, this Court analyzed the street sweep in narrower terms than the Court of Chancery, "view[ing] the street sweep as part of Newmont's own comprehensive defensive strategy," and thus under the guidelines of *Unocal*. *Ivanhoe Partners v. Newmont Min. Corp.*, Del.Supr., 535 A.2d 1334, 1343–44 (1987).

both firms opined that the Alcatel merger price was fair as of the later merger date.

Kahn supported his claim of inadequate price principally through the expert testimony of Fred Shinagle, an independent financial analyst, who opined that the fair value of Lynch on November 24, 1986 was $18.25 per share. He reached that conclusion by averaging equally the values he derived from market price, book value, earning power and capitalization.

Shinagle used the average market price for Lynch stock during the week of June 23, 1986 since Lynch and Alcatel first began discussion about a Celwave transaction on June 25. That average was $13.23 per share. He next computed Lynch's book value of $17.99 per share by applying a multiple of 1.7 to Lynch's accounting book value of $10.58 per share. The multiple was derived from the average book value multiple of six companies which Shinagle chose for comparison analysis. The information concerning the comparable companies was gathered from Standard & Poor's summary sheets using the Standard Industrial Code (SIC) Classification. Shinagle did not perform a first hand review of the financial statements of the comparable companies but relied solely upon the Standard & Poor material. Nor did Shinagle perform any independent research on Lynch's production and industry but relied instead on information relayed by Dertinger.

Shinagle's capitalization value for Lynch, $27.92 per share, was secured by multiplying the book capitalization figure of $11.17 per share by 2.5. This multiple was not the average but the highest of the six comparable companies. He justified the use of the highest multiple on the ground that Lynch had a lower debt to equity ratio than any of the comparables. He believed that an inverse correlation exists between debt-to-equity and capitalization multipliers.

Finally, Shinagle devised a value for earning power of $13.37 per share again by calculating average multiples from his comparable companies for revenue, net income and cash flow. These multiples applied against Lynch's forecasted revenue, net income and cash flow yield results which he averaged to reach earning power value.

In addition to the testimony of his valuation expert, Kahn offered the view of Dertinger, Lynch's CEO at the time of the merger, who testified that he thought the fair value of Lynch at the time of the merger was $20 per share. Dertinger considered "two values of Lynch: Our marketing value—that is in the eyes of our customers—and the value of Lynch on Wall Street as exemplified primarily by the stock price. But I think that is definitely secondary to a company's potential." Board member Hubert Kertz also testified that in his opinion Lynch's value was well above the $14 merger price. Although conceding that "not being a financial man but being a manager" he thought that "even under almost the worst scenario, it ought to be somewhere in the high teens or $20 a share."

In its fair price analysis, the Court of Chancery accepted the fairness opinions tendered by Alcatel and found the merger price fair. The court rejected Kahn's attack on the merger price because it found the Shinagle valuation methodology to be flawed for the reason set forth in the trial court's 1993 decision. Those deficiencies included Shinagle's decision to use the highest capitalization ratio instead of the average as he did with his other calculations involving the comparable companies. The court noted that had Shinagle used the average capitalization rate of the comparable companies, consistent with his use of averages for his other valuation approaches, his capitalization value would have been $13.18 per share instead of the $27.92 per share produced by applying the highest capitalization ratio. The court rejected Shinagle's assumption that debt/equity ratio correlates to a high capitalization ratio as unjustified.

■ In resolving issues of valuation the Court of Chancery undertakes a mixed determination of law and fact. When faced with differing methodologies or opinions the court is entitled to draw its own conclusions from the evidence. *Kahn v. Household Acquisition Corp.*, Del.Supr., 591 A.2d 166, 175 (1991). So long as the court's ultimate determination of value is based on the application of recognized valuation standards, its accep-

tance of one expert's opinion, to the exclusion of another, will not be disturbed. *Id.*

■ The Court of Chancery's finding that Alcatel had successfully born the initial burden of proving the fairness of the merger price is fully supportable by the evidence tendered by the experts retained by Alcatel and by the Independent Committee. Shinagle's opinions supporting a higher valuation were rejected as flawed and the testimony of Dertinger and Kertz not credited by the trial court because of the lack of analysis or objective support. Although the burden of proving fair price had shifted to Alcatel, once a sufficient showing of fair value of the company was presented, the party attacking the merger was required to come forward with sufficient credible evidence to persuade the finder of fact of the merit of a greater figure proposed. *See Cinerama, Inc. v. Technicolor, Inc.,* Del.Supr., 663 A.2d 1156, 1177 (1995); *Citron v. E.I. DuPont de Nemours & Co.,* Del.Ch., 584 A.2d 490, 508 (1990); *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 942 (1985). The Court of Chancery was not persuaded that Kahn had presented evidence of sufficient quality to prove the inadequacy of the merger price. We find that ruling to be logically determined and supported by the evidence and accordingly affirm.

### III

We next address the remaining question decided by the Court of Chancery in its 1993 decision but not resolved in *Lynch I*—whether Alcatel violated the duty of disclosure in its Offer to Purchase directed to Lynch shareholders. Kahn asserts that in light of this Court's finding that Alcatel used coercion to gain approval of the merger price by the Lynch board, the Offer to Purchase contained material omissions. To the contrary, Alcatel maintains that in both the Offer to Purchase and in its Schedule 13D filed with the Securities and Exchange Commission, Alcatel fully and clearly indicated that its option included a tender offer directly to stockholders if negotiations with the Lynch Board proved unsuccessful.

■ A controlling shareholder owes a duty of complete candor when standing on both sides of a transaction and must disclose fully all the material facts and circumstances surrounding the transaction. *Arnold v. Society for Sav. Bancorp, Inc.,* Del.Supr., 650 A.2d 1270, 1276 (1994). Information is deemed material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.,* Del. Supr., 493 A.2d 929, 944 (1985) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). The materiality standard is an objective one, determined from the perspective of the reasonable shareholder, not that of the directors or other party who undertakes to distribute information. *Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773, 779 (1993). In reviewing a ruling pursuant to these legal standards, this Court will review the entire record. *Id.* at 778. "[I]f the findings of the trial judge are sufficiently supported by the record and are the product of an orderly and logical deductive process, ... we accept them, even though independently we might have reached opposite conclusions." *Id.* (citations omitted).

■ We begin our examination of the record below with the allegedly deficient documents. The Offer to Purchase, distributed to *Lynch* shareholders at the Board's behest and apparently under Alcatel's direction, described Alcatel's negotiation stance as follows:

Discussions between representatives of Dillon Read on behalf of Alcatel USA and the Independent Committee and its financial advisors continued during the period from November 12 to November 20, 1986. During such discussions representatives of Alcatel USA informed the Independent Committee that, in the event the parties could not reach an agreement for a transaction, Alcatel USA would consider the options that were available to it at that time, including among other things, making an offer directly to the stockholders of the Company.

In its 1993 decision, the Court of Chancery found that the Offer to Purchase and this

language in particular "sufficiently describe Alcatel's position. They alert a reasonable investor that Alcatel had a certain amount of bargaining leverage and was using it." On remand, the Court of Chancery held to the same conclusion, stating: "The Supreme Court's description of the negotiations as coercive does not mandate the use of that term in the proxy materials."

Kahn argues that Alcatel's description of its negotiating options was incomplete and misleading and should have conveyed the additional information that its "making an offer" would have been "far below the merger price of $15.50 per share." The narrow question thus becomes whether a reasonable shareholder would have considered the additional language "as having significantly altered the total mix of information made available." *Arnold v. Bancorp,* 650 A.2d at 1277.

Although the additional language may have rendered the Offer to Purchase somewhat more informative by "closing the circle" on the full extent of Alcatel's options, we agree with the Court of Chancery that such additional language was not required to describe the extent of Alcatel's bargaining power. *See Seibert v. Harper & Row Publishers, Inc.,* Del.Ch., C.A. No. 6639, 10 Del.J.Corp.L. 645, 655, 1984 WL 21874, Berger, V.C. (Dec. 5, 1984) (noting that a proxy statement need not disclose facts which are "generally known"). There can be little doubt that Alcatel intended to acquire the entire equity interest in Lynch and the description of negotiations contained in the Offer to Purchase described its efforts and the responses of the Lynch Board and the Independent Committee. The Offer to Purchase disclosed the full range of value advanced by the parties during negotiations and notes that the final price of $15.50 was not within the preliminary range but reflects the change in financial projections based on Lynch's third-quarter results.

Kahn concedes that Alcatel was not required to describe its own conduct as coercive but at the same time argues that the Offer to Purchase should have contained sufficient facts concerning Alcatel's negotiation

power to permit the minority shareholders of Lynch to gain the same impression. This contention overstates the effect of our holding in *Lynch I* and misconceives the requirements of materiality. *Weiss v. Rockwell Int'l Corp.,* Del.Ch., C.A. No. 8811, 15 Del. J.Corp.L. 777, 787, 1989 WL 80345, Jacobs, V.C. (July 10, 1989) ("To argue, as plaintiff does, that the proxy statement should have embellished these disclosures by adding to them a confession of corporate wrongdoing ... is simply not required."), *aff'd,* Del.Supr., 574 A.2d 264 (1990). A reasonable minority shareholder of Lynch was under no illusions concerning the leverage available to Alcatel and its willingness to use it to acquire the minority interest.

Alcatel's consideration of available options including "making an offer directly to the stockholders" is obviously conveying an intent to terminate negotiations with the Board and engage in a hostile tender offer. The materiality of the tendered information is the statement of Alcatel's range of options and that such options were disclosed to the Independent Committee as part of the negotiations that led to the agreement of the Lynch Board to recommend the merger prices. In our view nothing further was required and we find the holding of the Court of Chancery that no disclosure violation occurred here to be clearly supported by the record.

The Court of Chancery's finding of no disclosure violation, which we endorse, though not determinative of entire fairness, is of "persuasive substantive significance." *Cinerama, Inc. v. Technicolor, Inc.,* Del. Supr., 663 A.2d 1156, 1176 (1995). Such a determination precludes the award of damages *per se,* bears directly upon the manner in which stockholder approval was obtained, and places this case in the category of "nonfraudulent transactions" in which price may be the preponderant consideration. *Id.* (quoting *Weinberger v. UOP, Inc.,* 457 A.2d at 711.)[3] Although the merger was not conditioned on a majority of the minority vote, we note that more than 94 percent of the shares were tendered in response to Alcatel's offer.

---

**3.** Our affirmance of the Court of Chancery's disclosure violation determination renders unneces-

sary any consideration of Kahn's damages claims.

## IV

In summary, after reassessing the trial record under an entire fairness standard, with the burden of proof upon Alcatel, the Court of Chancery determined that, as a result of the manner by which the board discharged its fiduciary duties, the timing and structure of negotiations and the disclosure to shareholders of such event were the product of fair dealing. Similarly, the trial court concluded that the merger price was fair. *Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d at 1172. Thus the non-bifurcated standard of *Weinberger* was satisfied. Under our standard of review, we defer to the trial court's evidentiary findings if supported by the record and logically determined. *Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d at 1178.

In deciding the ultimate question of entire fairness, the Court of Chancery was required to carefully analyze the factual circumstances in the context of how the board discharged all of its fiduciary duties, apply a disciplined balancing approach to its findings, and articulate the basis for its decision. *Cinerama, Inc. v. Technicolor, Inc.*, Del.Supr., 663 A.2d at 1179. The record reflects that was done. We find no error in the trial court's application of legal standards and accordingly affirm. *Id.*