Alan Russell KAHN, Plaintiff
Below, Appellant,

v.

TREMONT CORPORATION, Susan E.
Alderton, Richard J. Boushka, J. Landis
Martin, Glenn R. Simmons, Harold C.
Simmons, Michael A. Snetzer, Thomas
P. Stafford, Avy H. Stein, and Valhi,
Inc., Defendants Below, Appellees.

No. 170, 1996.

Supreme Court of Delaware.

Submitted: Feb. 27, 1997.
Decided: June 10, 1997.

Norman M. Monhait and Carmella P. Keener, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington. Of Counsel: Sidney B. Silverman, (argued), Silverman, Harnes & Harnes, New York City, for Appellant.

Jesse A. Finkelstein, Richards, Layton & Finger, Wilmington. Of Counsel: Timothy R. McCormick and Jacob Marshall, Thompson & Knight, Dallas, Texas, for Appellees Tremont Corporation, Richard J. Boushka, Thomas P. Stafford, and Avy H. Stein.

Henry N. Herndon, Jr. and Joseph C. Schoell, Morris, James, Hitchens & Williams, Wilmington. Of Counsel: Donald E. Scott (argued) and Lester C. Houtz, Bartlit, Beck, Herman, Palenchar & Scott, Denver, Colorado, for Appellees Valhi, Inc., Susan E. Alderton, J. Landis Martin, Harold C. Simmons, Glenn R. Simmons, and Michael A. Snetzer.

Before WALSH, HOLLAND, and BERGER, JJ. and RIDGELY, President Judge * and QUILLEN, Judge,* constituting the Court En Banc.

WALSH, Justice.

This is an appeal by a plaintiff-shareholder, Alan R. Kahn ("Kahn"), from a decision of the Court of Chancery which approved the purchase by Tremont Corporation ("Tremont") of 7.8 million shares of the Common Stock of NL Industries, Inc. ("NL"). The shares, constituting 15% of NL's outstanding stock, were purchased from Valhi, Inc. ("Valhi"), a corporation which was 90 percent owned by a trust for the family of Harold C. Simmons ("Simmons").[1] In turn, Valhi was

---

* Appointed pursuant to Art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 and 4.

**1.** The Simmons Trusts did not control Valhi directly, but did so through its 100% ownership of

the stock in Contran Corporation ("Contran"), which, in turn, owned 90% of the outstanding stock of Valhi.

the owner of a majority of NL's outstanding stock and controlled Tremont through the ownership of 44% of its outstanding shares.

Kahn alleges that Simmons effectively controlled the three related companies and through his influence, structured the purchase of NL shares in a manner which benefited himself at the expense of Tremont. Following a six day trial, the Court of Chancery concluded that due to Simmons status as a controlling shareholder, the transaction must be evaluated under the entire fairness standard of review and not the more deferential business judgment rule. Nevertheless, the court found that Tremont's utilization of a Special Committee of disinterested directors was sufficient to shift the burden on the fairness issue to Kahn. With the burden shifted, the court concluded that both the price and the process were fair to Tremont.

Kahn has raised two contentions in this appeal: (i) that the court erred in its burden of proof allocation regarding the entire fairness of the transaction; and (ii) that the circumstances surrounding the purchase of NL shares indicate that the process was tainted and the price unfair to Tremont. After careful review of the record, we conclude that under the circumstances the Special Committee did not operate in an independent or informed manner and therefore, the Court of Chancery erred in shifting the burden of persuasion to Kahn. Accordingly, the judgment of the Court of Chancery is reversed and the matter remanded for a new fairness determination with the burden of proof upon the defendants.

I

The lengthy presentation before the Court of Chancery requires a full exposition of the factual background of the dispute for analysis on appeal. Tremont is a Delaware corporation with its principal executive offices located in Denver, Colorado. Through its subsidiaries, Tremont produces titanium sponge, ingot and mill products. NL is a New Jersey corporation which derives a majority of its earnings from the manufacture and sale of titanium dioxide ("TiO2"), a chemical used to impart whiteness or opacity. NL conducts this business through its European subsidiary Krones, which, accounts for 85% to 90% of NL's total revenue. Valhi is also a Delaware corporation which, through subsidiary stock ownership, is engaged in a variety of businesses, including the production and sale of hardware, forest products, refined sugar, and the fast food restaurant business.

The individual defendants, collectively the board of directors of Tremont, are Susane E. Alderton, Richard J. Boushka, J. Landis Martin, Glenn R. Simmons, Harold C. Simmons, Michael A. Snetzer, Thomas P. Stafford and Avy H. Stein. Aside from their service on the Tremont board, several defendants hold influential positions with other Simmons' controlled entities. Harold Simmons is chairman of the board of Valhi, NL, and Contran, and the CEO of Contran and Valhi. J. Landis Martin is both the president and CEO of NL and Tremont. Susan E. Alderton serves as the vice president and treasurer of Tremont and NL. Glenn R. Simmons is the vice chairman of the board of Valhi as well as the vice chairman of the board and vice president of Contran. Michael A. Snetzer is the president of Valhi and Contran and a director of NL and Contran.

Kahn alleges that the defendants willingly participated in a series of improper transactions, beginning in 1990, which were orchestrated by Simmons for his own benefit. Specifically, he argues that the purchase of NL shares by Tremont was the final step in a series of transactions whereby Simmons was able to shift liquidity from several of his controlled companies to Valhi. Under the theory advanced by Kahn, two preceding transactions, a repurchase program and a "Dutch auction," were initiated in order to artificially inflate the price of NL shares. By increasing NL's per share price, Simmons was able to divest himself, at the expense of Tremont, of the stock in a failing company for above market prices.

In late 1990, NL's board believed that the current market price of NL's stock, then selling between $10 and $11 per share, was significantly undervalued. Accordingly, on October 2, 1990, the board authorized a repurchase program in the open market for up to five million shares. On the prior day NL

stock had closed at $10.12 per share. Over the first three months of the program, through January 10, 1991, NL repurchased almost two million shares, at a total cost of over $22 million and an average price of approximately $11 per share.

Satisfied with this response, NL suspended its repurchases from January through May of 1991. From May to July 1991, however, NL resumed buying and purchased 733,700 shares on the open market for a total cost of $10 million or approximately $13.50 a share. The repurchase program was again suspended from August of 1991 to September 11, 1991. Following this brief hiatus, NL once again reinstated its open-market repurchases and continued to repurchase shares into early 1992. All told, NL repurchased over 3 million of its own shares at an average price of $12 per share.

In June of 1991, NL shares were trading at or above $15 per share. At this point NL, as the result of selling a large block of Lockheed stock, was holding approximately $500 million in cash to be used for investment purposes. In August 1991, with the market price of the stock at $16, NL's management decided that it would be advantageous for the company to buy additional NL shares beyond the five million already authorized in the share repurchase program. Accordingly, on August 6, 1991, the NL board voted to approve a Dutch auction self-tender offer for 10 million shares of NL.

Under the Dutch auction mechanism, each shareholder of NL would decide how many, if any, shares to tender and at what price within a designated price range. After the expiration of the auction period, NL would determine the lowest uniform price, within a preset range of $14.50 to $17.50, that would enable it to purchase 10 million shares. All of the shares tendered at or below the sale price would be purchased at the sale price, subject to proration. In the event that more than 10 million shares were tendered at or below the sale price, NL had the option to purchase an additional 1.3 million shares.

On the date the Dutch auction was announced, Valhi owned approximately 68% of the 63.4 million outstanding shares of NL. Valhi tendered all of its shares, at $16, recog-

nizing that with proration it would sell, at most, approximately 10 million shares. At the close of the Dutch auction, $16 per share proved to be the lowest price within the range at which NL could purchase the shares. On September 12, 1991, NL accepted for purchase 11,268,024 shares, 10,928,750 of which were acquired from Valhi. Shortly following the close of the Dutch auction, NL's stock price fell from $16 to around $13.50.

Upon completion of the Dutch auction, Valhi had sold 10.9 million shares of NL and had reduced its ownership interest in the company from 68% to 62%. If Valhi could sell an additional 7.8 million shares of NL and reduce its ownership interest to below 50%, it would be able to reap two significant benefits. First, it would receive a tax savings of approximately $11.8 million on its proceeds from the Dutch auction, a potential savings of $1.52 per share. Secondly, Valhi would be in a position to deconsolidate NL from its financial statements, thereby improving its access to capital markets. In order to obtain these benefits, however, Valhi needed to sell 7.8 million shares of NL, amounting to 15% of NL's outstanding stock, by the end of calendar year 1991.

To explore the prospect of a further sale of NL shares, Snetzer, Valhi's President, contacted two potential purchasers, RCM Capital and Keystone Inc. Although both maintained significant holdings of NL shares, neither was interested in further purchases. Snetzer also contacted Salomon Brothers and requested an opinion concerning the marketability of the stock. Snetzer was advised by Salomon Brothers that its equity syndicate groups in the U.S. and Europe as well as its private equity people, were in agreement that Valhi would incur an illiquidity discount of 20%, or greater, against NL's then market price in order to sell this unregistered stock in a series of private transactions. Snetzer did not retain Salomon to negotiate a sale because in his view Valhi was unwilling to sell the block of NL shares at that price.

Finding the alternatives unacceptable, Valhi decided to approach Tremont, which had

$100 million in excess liquidity and was in the process of searching for a productive investment opportunity.[2] Snetzer was of the opinion that an "all in the family" transaction would be more desirable since it had the potential to yield additional benefits for both companies. As a 44% owner of Tremont, Valhi would be more likely to accept an appropriate discount·from market because it would still own an indirect 44% interest in the shares. In addition, a lower discount from market might be acceptable to Tremont because its management had access to better information concerning NL's business prospects than any unrelated buyers whom Salomon had considered. As a better informed purchaser, Tremont would be less susceptible to risk than would be a stranger and might be willing to pay a price closer to market. Based on this reasoning, on September 18, 1991, Snetzer wrote to Landis Martin, the President and CEO of Tremont, to propose the sale of 7.8 million shares of NL stock.

After speaking with Snetzer, Martin wrote to Tremont's three outside directors, Richard Boushka, Thomas Stafford, and Avy Stein, asking them to formulate an appropriate response to Valhi's offer. The three men were thereafter designated by the Tremont board as a Special Committee for the purpose of considering the proposal and recommending a course of action. Although the three men were deemed "independent" for purposes of this transaction, all had significant prior business relationships with Simmons or Simmons' controlled companies.

Stein, a lawyer, was affiliated with the law firm which represented Simmons on several of his corporate takeovers and had worked closely with Martin. In 1984 Stein left the law firm to organize and promote various business ventures. Over the next five years, Martin invested in projects which Stein was promoting despite their poor performance. In October of 1988, Stein's business ventures had all but dried up when Martin, then at NL, offered Stein a consulting position at $10,000 a month and bonuses to be paid at Martin's discretion. Stein remained in this position for one year, earning bonuses totaling $325,000, before taking a position with two subsidiaries of Continental Bank, N.A. Stafford was employed by NL in connection with Simmons' proxy contest to acquire control of Lockheed and received $300,000 in fees. Boushka was initially named to Simmons' slate of directors in connection with the Lockheed proxy contest and was paid a fee of $20,000.

Of the three Special Committee members, Stein was the most closely connected to management. Nevertheless, he assumed the role of chairman of the Special Committee and directed its operations. Stafford and Boushka deferred to Stein in the selection of both the financial and legal advisors for the Special Committee. The Court of Chancery noted that Stein's selection of advisors was not reassuring.

In choosing a financial advisor, the Special Committee considered several banking firms, both national and regional. In the end, at Stein's recommendation, the Special Committee retained Continental Partners ("Continental"), a company with whom Stein was affiliated. Continental is a wholly-owned subsidiary of Continental bank which, in prior years, had earned significant fee income from Simmons related companies. The record also reflects that Martin, not a member of the Special Committee, signed the retainer agreement with Continental Partners. The Special Committee's selection of a legal advisor also took an unusual form. David Garten, General Counsel for both Tremont and NL, recommended C. Neel Lemon of Thompson & Knight as the Special Committee's counsel. In addition, Garten assumed the responsibility for performing the conflicts check. Lemon had previously represented a Special Committee of NL in connection with

---

2. In October 1990, Tremont's corporate predecessor, Baroid Corp., divided itself into two parts, each to be publicly traded. As part of the spin-off, the new company contributed $100 million of capital to Tremont for acquisition purposes. Tremont had disclosed to its stockholders that the company intended to use this capital to attempt acquisitions, including "participation in

the acquisition activities conducted by NL, Valhi and other companies that may be deemed to be controlled by Harold C. Simmons" and "could involve ... the acquisition of securities or other assets from such related parties." Prior to the purchase of the NL shares from Valhi, Tremont's excess capital had been invested temporarily in Treasury bills.

a proposed merger between NL and Valhi and had also represented an underwriter in connection with a proposed convertible debt offering by Valhi.

On October 8, 1991, Boushka and Stein, along with their advisors, met with representatives of NL to receive a presentation on the business, operating results and prospects of NL. The following day, they met with representatives of Valhi for a presentation of the business purposes behind Valhi's proposal, specifically the tax benefits Valhi hoped to achieve by deconsolidating NL from its balance sheet. In the afternoon following each presentation, a second meeting was held so that the Special Committee members, Continental and the legal advisors could analyze the material presented in the morning sessions.

Stafford, who was in Europe on other business, was unable to attend any of the Special Committee meetings. He kept abreast of events through telephone conferences with the other two members. Boushka attended the morning sessions but did not attend the afternoon sessions. Of the three members of the Special Committee only Stein attended all four meetings and, more importantly, he was the only member who attended the review sessions with the Special Committee's advisors. In addition to the presentations, the Special Committee met twice, later in October, to consider the Valhi proposal prior to the final negotiations.

In considering the NL shares purchase, the Special Committee relied heavily upon the financial analysis performed by NL and its advisor Continental. During the October 8 meeting, NL provided information including its economic projections for the future price of TiO2, estimates of NL's earnings and the assumptions underlying these projections. With respect to the future price of TiO2, NL's projections assumed that an existing slump would end in late 1992 and higher prices and profits would return in the years 1993–1996.

The Special Committee requested Continental independently to assess the reasonableness of NL's projections. In performing a market analysis, Continental utilized five different methodologies to determine the value of the NL stock. These included a comparable company analysis, a comparable transaction analysis, a discounted cash flow analysis, an asset value/replacement cost analysis and a market value analysis. The results of this study were presented at the Special Committee's October 30 meeting. Continental determined that the intrinsic value of the NL shares was between $13 and $20 per share. In addition to this report, Boushka requested that an independent consultant provide a separate analysis concerning future TiO2 prices. Although Boushka did not receive this report prior to the Special Committee's vote on October 30, the consultant appeared to support NL's projections for TiO2 prices.

In hindsight, the price of TiO2 would continue to be much more volatile than either NL's or Continental's predictions. During the late 1980's NL experienced record earnings when TiO2 was in short supply and prices were high. Beginning in 1990, however, prices began to fall as Europe entered into a recession and supply began to catch up with the demand. By year-end 1991, the price of TiO2 had dropped 20% from its high in 1989 and 15% from 1990. As a result, by the end of 1991 NL's profits had turned to losses and it was projected that 1992's operating results would be worse. In fact, in 1992, NL was forced to suspend its dividend as its year-end losses totaled $76.44 million. As of the time of the transaction, it was anticipated that world TiO2 prices would not begin to stabilize until 1995–1997.

Valhi's initial proposal to Tremont, made at the October 9 Special Committee meeting, was $14.50 per share, with no registration rights or other provisions to enhance the liquidity of the shares. On the previous day NL stock had closed at $13 per share. By the October 21 Special Committee meeting, Continental had developed a preliminary estimate of value in the $12.50 to $23 range. Following this meeting, Stein contacted Snetzer and informed him that some provision to afford liquidity to the buyer of the unregistered shares would be necessary. He also attempted to negotiate a per share price below the $14.50 offer. In response, Snetzer suggested Valhi might be willing to lower the

asking price below $14 into the high $13 range. On that day NL stock closed slightly over $13 per share.

Stein and Snetzer also met in person to negotiate the non-price terms of the transaction. At the meeting the two discussed solutions to Tremont's liquidity concerns such as registration and co-sale rights, but did not broach the topic of a liquidity discount. Stein also told Snetzer that Tremont would not be willing to consummate a deal near the range suggested by Snetzer—the low to mid $13s. At its October 30 meeting the Special Committee decided to seek a transaction at or below $12⅝ per share. Continental indicated that it would be willing to deliver a fairness opinion supporting this price. Stein then met with Snetzer and offered to purchase the stock for $11.25. Eventually it was agreed that the price would be $11.75 per share with Valhi receiving a proration of NL's fourth quarter dividend, amounting to $800,000. In addition Tremont was to receive the registration and co-sale rights as protection for the limited liquidity of the investment. On this date NL stock closed at $12¾.

Stein presented the results of his negotiation with Snetzer to the entire Committee which, on October 30, 1991, agreed to recommend the transaction to the entire Tremont board. The Tremont board then met and approved the recommendation of the Special Committee, with the three most interested members of the board (H. Simmons, G. Simmons, and Snetzer) abstaining and the other two members (Martin and Alderton) voting with the Special Committee to provide a quorum.

## II

▮ Kahn's attack on both the negotiating process and the resulting price must be evaluated under the standards of Delaware corporate law involving interested transactions by controlling shareholders. In discharging our appellate function, we view the factual findings of the Court of Chancery with considerable deference but exercise de novo re-

view concerning the application of legal standards. *See Levitt v. Bouvier*, Del.Supr., 287 A.2d 671 (1972).

▮ Ordinarily, in a challenged transaction involving self-dealing by a controlling shareholder, the substantive legal standard is that of entire fairness, with the burden of persuasion resting upon the defendants.[3] *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 710 (1983); *See Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 937 (1985). The burden, however, may be shifted from the defendants to the plaintiff through the use of a well functioning committee of independent directors. *Kahn v. Lynch Communication Sys.*, Del.Supr., 638 A.2d 1110, 1117 (1994). Regardless of where the burden lies, when a controlling shareholder stands on both sides of the transaction the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard. *Id.* at 1116.

Entire fairness remains applicable even when an independent committee is utilized because the underlying factors which raise the specter of impropriety can never be completely eradicated and still require careful judicial scrutiny. *Weinberger*, 457 A.2d at 710. This policy reflects the reality that in a transaction such as the one considered in this appeal, the controlling shareholder will continue to dominate the company regardless of the outcome of the transaction. *Citron v. E.I. Du Pont de Nemours & Co.*, Del. Ch., 584 A.2d 490, 502 (1990). The risk is thus created that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder. *Id.* Consequently, even when the transaction is negotiated by a special committee of independent directors, "no court could be certain whether the transaction fully approximate[d] what truly independent parties would have achieved in an arm's length negotiation." Id. Cognizant of this fact, we have chosen to apply the entire fairness standard to "interested transactions"

**3.** The Court of Chancery determined that the sale of NL stock to Tremont was an "all in the family" transaction, with Simmons acting as the controlling shareholder of both the buyer and the seller. This ruling was not challenged by the defendants in this appeal.

in order to ensure that all parties to the transaction have fulfilled their fiduciary duties to the corporation and all its shareholders. *Kahn*, 638 A.2d at 1110.

Having established the appropriate legal standard by which the sale of NL stock will be reviewed, we turn to the issue of which party bears the burden of proof. Delaware has long adhered to the principle that the controlling or dominant shareholder is initially allocated the burden of proving the transaction was entirely fair. *Id.* at 1117. In *Rosenblatt,* however, we stated that "approval of a [transaction], as here, by an informed vote of a majority of the minority shareholders, while not a legal prerequisite, shifts the burden of proving the unfairness of the transaction entirely to the plaintiffs." *Rosenblatt,* 493 A.2d at 937. To obtain the benefit of burden shifting, the controlling shareholder must do more than establish a perfunctory special committee of outside directors. *Rabkin v. Olin Corp.,* Del.Ch., C.A. No 7547 (Consolidated), Chandler, V.C., 1990; *reprinted in* 16 Del.J.Corp.L. 851, 861–62, 1990 WL 47648 (1990), *aff'd,* Del.Supr., 586 A.2d 1202 (1990). Rather, the committee must function in a manner which indicates that the controlling shareholder did not dictate the terms of the transaction and that the committee exercised real bargaining power "at an arms-length." *Id.*

Here, Tremont, with Valhi's approval, established a Special Committee consisting of three outside directors. In evaluating the composition of Tremont's Special Committee, the Court of Chancery confessed to "having reservations concerning the establishment of the Special Committee and the selection of its advisors." The court's reservations arose from two main concerns. First, Stein was the dominant member of the Special Committee and played a key role in the negotiations. The Chancellor questioned the Special Committee's decision to leave the bulk of the work in the hands of one "who had a long and personally beneficial relationship with Mr. Martin [and Simmons' controlled companies]."

The court's second concern was prompted by its recognition that in complicated financial transactions such as this, professional advisors have the ability to influence directors who are anxious to make the right decision but who are often *in terra cognito.* As the Chancellor noted, "the selection of professional advisors for the Special Committee doesn't give comfort; it raises questions." Notably, Tremont's General Counsel suggested the name of an appropriate legal counsel to the Special Committee, and that individual was promptly retained. The Special Committee chose as its financial advisor a bank which had lucrative past dealings with Simmons-related companies and had been affiliated with Stein through his employment with a connected bank.

Despite these reservations and the appearance of conflict, the Chancellor concluded that the Special Committee's advisors satisfied their professional obligations to the Special Committee. The Chancellor further concluded that the Special Committee had discharged its duties in an informed and independent manner. These findings were sufficient, in the Chancellor's view, to shift to the plaintiff the burden of proving that the transaction was unfair.

In our view, the Court of Chancery's determination that the Special Committee of Tremont's outside directors was fully informed, active and appropriately simulated an arms length transaction, is not supported by the record. It is clear that Boushka and Stafford abdicated their responsibility as committee members by permitting Stein, the member whose independence was most suspect, to perform the Special Committee's essential functions. In particular, Stafford's absence from all meetings with advisors or fellow committee members, rendered him ill-suited as a defender of the interests of minority shareholders in the dynamics of fast moving negotiations. Similarly, the circumstances surrounding the retaining of the Special Committee's advisors, as well as the advice given, cast serious doubt on the effectiveness of the Special Committee.

In our view, the Special Committee established to negotiate the purchase of the block of NL stock did not function independently. All three directors had previous affiliations with Simmons or companies which he controlled and, as a result, received significant

financial compensation or influential positions on the boards of Simmons' controlled companies. Of the three directors, Stein was arguably the one most beholden to Simmons. In 1988 Stein was paid $10,000 a month as a consultant to NL and received over $325,000 in bonuses. The Special Committee's advisors did little to bolster the independence of the principals. The financial advisor, Continental Partners, was recommended by Stein and quickly retained by the full Special Committee. In the past, an affiliate bank of Continental had derived significant fees from Simmons controlled companies and at the time of the transaction was affiliated with Stein's current employer. In addition to being recommended by the General Counsel for NL and Tremont, the Special Committee's legal advisor had previously been retained by Valhi in connection with a convertible debt offering and by NL with respect to a proposed merger with Valhi.

From its inception, the Special Committee failed to operate in a manner which would create the appearance of objectivity in Tremont's decision to purchase the NL stock. As this Court has previously stated in defining director independence: "[i]t is the care, attention and sense of individual responsibility to the performance of one's duties ... that generally touches on independence." *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 816 (1984). The record amply demonstrates that neither Stafford nor Boushka possessed the "care, attention and sense of responsibility" necessary to afford them the status of independent directors. The result was that Stein, arguably the least detached member of the Special Committee, became, *de facto*, a single member committee—a tenuous role. Stein conducted all negotiations over price and ancillary terms of the proposed purchase with Martin, and did so without the participation of the remaining two directors. "If a single member committee is to be used, the member should, like Caesar's wife, be above reproach." *Lewis v. Fuqua*, Del.Ch., 502 A.2d 962, 967 (1985).

The record is replete with examples of how the lack of the Special Committee's independence fostered an atmosphere in which the directors were permitted to default on their obligation to remain fully informed. Most notable, was the failure of all three directors to attend the informational meetings with the Special Committee's advisors. These meetings were scheduled so that the Special Committee could explore, through the exchange of ideas with its advisors, the validity of the Valhi proposal and what terms the board should demand in order to make the purchase more beneficial to Tremont. Although Boushka had requested an independent analysis with respect to the future of the TiO2 market, and one was ordered, the report was not read prior to the Special Committee's October 30 vote on the purchase of the NL stock.[4] The failure of the individual directors to fully participate in an active process, severely limited the exchange of ideas and prevented the Special Committee as a whole from acquiring critical knowledge of essential aspects of the purchase. In sum, we conclude that the Special Committee did not operate in a manner which entitled the defendants to shift from themselves the burden which encumbers a controlled transaction. *Accord Kahn*, 638 A.2d at 1110.

## III

Although our invalidation of the role of the Independent Committee requires a remand for an entire fairness determination with the burden shifted, Kahn has asserted certain claims of "unfair dealing" which we address for the guidance of the parties and the Court of Chancery.

In *Weinberger* this Court stated that the test of fairness has two aspects: fair price and fair dealing. *Weinberger*, 457 A.2d at 711. *See also Cinerama v. Technicolor, Inc.*, Del.Supr., 663 A.2d 1156 (1995). The element of "fair dealing" focuses upon the conduct of the corporate fiduciaries in effectuating the transaction. These concerns include

---

4. This report takes on particular significance in light of the fact that Continental in evaluating Valhi's proposal, had relied upon NL's pricing forecast for TiO2. Without the benefit of this independent analysis, the directors, as buyers, relied solely on the projections of NL, the seller. Indeed, Stafford was not aware of the need for a third party analysis because he erroneously thought that Continental had made its own independent forecast.

how the purchase was initiated, negotiated, structured and the manner in which director approval was obtained. *Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261, 1280 (1988). The price element relates to the economic and financial considerations relied upon when valuing the proposed purchase including: assets, market values, future prospects, earnings, and other factors which effect the intrinsic value of the transaction. *Weinberger*, 457 A.2d at 711. This Court and the Court of Chancery have historically applied this heightened standard to ensure that individuals who purport to act as fiduciaries in the face of conflicting loyalties exercise their authority in light of what is best for all entities. *Id.*

Kahn alleges the Court of Chancery erred in several respects in its entire fairness analysis. As to the fair dealing component, Kahn argues that: (1) the initiation and the timing of the purchase were unfair; (2) the Special Committee's performance was deficient to an extent that it compromised the integrity of the negotiation process; and (3) Valhi failed to make material disclosures to Tremont. We address only the initiation and timing claim and the disclosure claim as they may find application in any proceedings on remand.

### A.

In evaluating the fair dealing component of the transaction, the Court of Chancery determined that the initiation and timing of the purchase was not prejudicial to Tremont. Although the purchase was initiated and timed by Simmons-controlled Valhi, the court found this to be unimportant when considering the nature of the transaction, *i.e.*, a straightforward purchase of a block of stock. Valhi's decision to offer the stock to Tremont was predicated on its desire to obtain over $11 million in tax benefits. This fact was fully disclosed and explained to the Special Committee which arguably bargained to share in those benefits. The record supports the Chancellor's conclusion that the Committee was afforded adequate time to fully consider Valhi's proposal and to assess its merits. Snetzer, Valhi's president, first proposed the transaction to Tremont in September of 1991 and indicated Valhi's need to conclude the purchase by the end of that calendar year. Although the Tremont board did not take advantage of the entire time period provided, under the terms of Valhi's offer they were afforded sufficient time to consider the proposal.

Initiation by the seller, standing alone, is not incompatible with the concept of fair dealing so long as the controlling shareholder does not gain financial advantage at the expense of the controlled company. *Kahn v. Lynch Communication Sys.*, Del.Supr., 669 A.2d 79, 85 (1995). While Valhi obtained a significant financial advantage in the timing of the purchase, it did not do so at the expense of Tremont. We conclude that there is ample support in the record for the Court of Chancery's finding that the initiation and timing of the transaction was not unfair to Tremont.

### B.

With respect to the disclosure issue, Kahn argues that Valhi was required to disclose that two previous companies had rejected an offer to purchase the block of NL stock and that Salomon Brothers had issued an informal opinion which opined that a 20% or greater illiquidity discount from market would be required in order to conclude a sale. In evaluating this claim the Court of Chancery correctly stated that "[a] controlling shareholder ... must disclose fully all material facts and circumstances surrounding the transaction." *Kahn*, 669 A.2d at 88. This standard of disclosure is not unlike that adopted by this Court in defining the level of disclosure necessary where shareholder action is implicated. "[A]n omitted fact is material if there is a substantial likelihood that, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Rosenblatt*, 493 A.2d at 944 (quoting *TSC Industries v. Northway*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

Applying the materiality standard, the Court of Chancery determined that the decisions of RCM Capital and Keystone not to purchase the block of NL stock from Valhi were not material. The court noted that

their reasons for not wanting to purchase the stock were simply the general concerns that any potential purchaser would have reason to know without specific disclosure; "namely, that the purchaser would own a minority share in a company that it did not control and that the market might react negatively when it learned that a principal stockholder (Valhi) was selling shares." Kahn's argument as to the materiality of this information is further undercut by the fact that Valhi never reached the stage of discussing price or terms with either of the potential buyers. Thus, disinterest of third parties was clearly not the type of information required to be disclosed. We find the Court of Chancery's analysis as to the disclosure of RCM Capitol's and Keystone's decisions not to pursue a purchase with Valhi to be supported by the record.

Kahn's second disclosure argument concerns Salomon Brother's advice to Valhi concerning an appropriate illiquidity discount. Although questioning the significance of this information, the Chancellor, for analysis purposes, assumed that the Salomon opinion would have been material to the Special Committee. The court went on to conclude, however, that, even if material, this information fell within a "narrow residual category of privileged information" which did not need to be disclosed. The Chancellor speculated that if the device of the independent committee is to effectively replicate an arms-length negotiation, this information cannot be required to be disclosed by a seller.

We do not adopt the court's conclusion that the Salomon opinion falls within a category of "privileged" information. We find no authority in Delaware or elsewhere, and counsel for defendants can point to none, which supports the Chancellor's decision to carve out a "privilege" exception to the materiality standard.[5] Under the facts here present, we find Valhi had no duty to disclose information which might be adverse to its interests because the normal standards of arms-length bargaining do not mandate a disclosure of weaknesses.

The significance of the illiquidity discount to this transaction lies not in whether Valhi had a duty to disclose it but whether an informed independent committee had a duty to discover it.

## IV

■ Although the Chancellor made extensive findings incident to his fair price analysis he did so in a procedural construct which required Kahn to prove unfairness of price. In resolving issues of valuation the Court of Chancery undertakes a mixed determination of law and fact. *Kahn v. Household Acquisition Corp.,* Del.Supr., 591 A.2d 166, 175 (1991). We recognize the thoroughness of the Chancellor's fair price analysis and the considerable deference due his selection from among the various methodologies offered by competing experts. *Lynch Communication,* 669 A.2d at 87. But here, the process is so intertwined with price that under *Weinberger's* unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result. *Cf. Lynch Communication Systems,* 669 A.2d 79.

Arguably, as the Chancellor found, the resulting price might be deemed to be at the lowest level in a broad range of fairness. But this does not satisfy the *Weinberger* test. Although often applied as a bifurcated or disjunctive test, the concept of entire fairness requires the court to examine all aspects of the transaction in an effort to determine whether the deal was entirely fair. *Weinberger,* 457 A.2d at 711. When assigned the burden of persuasion, this test obligates the directors, or their surrogates, to present evidence which demonstrates that the cumulative manner by which it discharged all of its fiduciary duties produced a fair transaction. *Cinerama,* 663 A.2d at 1163.

In our recent decision in *Kahn v. Lynch Communication,* we were confronted with a situation in which the actions of the majority

---

5. If disclosure is required under the materiality test, information can be withheld only under a recognized claim of privilege. This Court has previously held the relationship between a corporation and its attorney to be such a recognized privilege. *Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773, 781 (1993) (citing *Upjohn Co. v. United States,* 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)).

shareholder dominated the negotiation process and stripped the independent committee of its ability to negotiate in an arms-length manner. After concluding that the Court of Chancery erred in shifting the burden of proof with regard to entire fairness to the controlling shareholder, we remand the matter to the Court of Chancery for "a redetermination of the entire fairness ... with the burden of proof remaining on Alcatel, the dominant and interested shareholder." *Kahn*, 638 A.2d at 1122. A similar course is appropriate here. It is the responsibility of the Court of Chancery to make the requisite factual determinations under the appropriate standards, which underlie the concept of entire fairness. Whether the defendants, shouldering the burden of proof, will be able to demonstrate entire fairness is, in the first instance, a task committed to the Chancellor.

In the event, the Court of Chancery determines that the defendants have not demonstrated the entire fairness of the disputed transaction, we assume that it will grant appropriate relief within its broad equitable authority. *Weinberger*, 457 A.2d at 714.

\*    \*    \*    \*    \*    \*

REVERSED and REMANDED.

QUILLEN, Judge, concurring.

With regard to the burden of proof on the issue of fairness, I concur in the decision reached by Justice Walsh in his excellent opinion. In my opinion, the burden of proof in the case *clearly* should *not* shift from the defendants to the plaintiff on the issue of fairness. Somewhat ironically, in reaching this conclusion, I do not find it necessary to go beyond the basic facts as found by the Chancellor. *See Kahn v. Tremont Corp., et al.*, Del.Ch., C.A. No. 12339, Allen, C., 1996 WL 145452 (Mar. 21, 1996, *revised* Mar. 27, 1996) (herein referred to as *"Op. Below"*). I also concur with Justice Walsh's opinion and decision that the initiation and timing of the purchase were not prejudicial to Tremont Corporation and his further opinion and decisions on the disclosure issues. As to these latter two points, which essentially affirm the Chancellor, I merely note that the Court appears unanimous.

This case is a derivative suit wherein the plaintiff, a stockholder of Tremont Corporation ("Tremont"), alleges that Tremont paid too much for 15% of the stock of NL Industries, Inc. ("NL") in a purchase from Valhi Corporation ("Valhi") through an unfair process. Valhi, controlled by Harold Simmons, itself owned 44.4% of Tremont and 62.5% of NL. The burden of proof on the issue of fairness turns on the independence of Tremont's Special Committee ("Committee") which recommended the purchase. Justice Walsh has ably reviewed the facts and his recitation is more than sufficient context for this modest endeavor.

I accept the Chancellor's statement of the nature of the proceedings and the facts of the case. *Op. Below* 1–15. I also accept the Chancellor's conclusion, in his strongest remark of several, that it is "perfectly appropriate in the circumstances" for Tremont to use its cash reserves to buy stock of NL. *Op. Below* 48–49. It is indeed important the law not "chill" transactions between related companies that can be mutually productive and beneficial to society. *See Op. Below* 3. As noted above, while I join in the reversal, I rely on the Chancellor's findings of basic fact to reach my own conclusion on the burden of proof. Although the same evidence can relate to both the issue of Committee independence and the issue of fairness, the issue of this Committee's independence in this peculiar factual context requires a separate focus from the ultimate issue of entire fairness.

The Chancellor's opinion found: a parent-subsidiary transaction existed, "the context in which the greatest risk of undetectable bias may be present" (*Op. Below* 17–18); Committee member Avy H. Stein, who had prior profitable connections to Harold Simmons and his companies, played the lead Committee role (*Op. Below* 19, including n. 12); Mr. Stein suggested the selection of a financial adviser for the Committee who had prior ties to both Mr. Stein and Mr. Simmons (*Op. Below* 9–10, including n. 5 and n. 6, and 19–20); the suggestion for the Committee's legal advisors came from Tremont's General Counsel (*Op. Below* 9–10, including n. 5 and n. 6, and 19–20); NL, in the thirteen months prior to the subject transaction, repurchased

over 20% of its own shares, at least raising an issue of manipulated price inflation (*Op. Below* 5–7); this transaction by Valhi, probably not available in 1991 with a non-Simmons enterprise, was a multi-million dollar one for Valhi from a tax savings standpoint and had to be accomplished in the last quarter of 1991 (*Op. Below* 7–8); Valhi's chief negotiator knew that an illiquidity discount was appropriate and the block was in fact worth less than market (*Op. Below* 8, 24); in a very short period, NL's stock price fell from over $16 per share in late summer 1991 to $12.75 on the date of the purchase, October 30, 1991, at least raising the question of business viability (*Op. Below* 6–7, 12–24); the Committee relied heavily on regularly prepared projections of NL's management with incomplete help from its own consultant (*Op. Below* 11–12, 31–32); notwithstanding knowledge of the appropriateness of a discount, Valhi's first negotiating suggestion was a premium price and the results of the Committee's negotiations on other issues, splitting the fourth quarter dividend and registration and co-sale rights, are not self-verifying on the independence issue (*Op. Below* 1, 13–14 including n. 8); and the price, as finally negotiated, was found to be "as small a discount as could be accepted as fair," a finding that hardly forecloses questions as to independence (*Op. Below* 33).

In light of the above-enumerated factors, the independence of the Special Committee, integrity in a process sense, was clearly not substantial enough to shift the burden of persuasion to the plaintiff on the issue of fairness. To me, the case cries for Missouri skepticism; the burden should be on the control group to demonstrate entire fairness. While it can be of critical importance to the ultimate result whether or not the burden is shifted, failure to shift the burden is not necessarily outcome determinative. *Compare Nixon v. Blackwell,* Del.Supr., 626 A.2d 1366, 1376, 1381 (1993). Justice Walsh's decision appropriately remands the case to the Court of Chancery for the requisite factual determinations.

As to remedy, if any proves to be appropriate, I join Justice Walsh's opinion that all options are open to the Chancellor's discretion. *Lynch v. Vickers Energy Corp.,* Del. Supr., 429 A.2d 497, 507–08 (1981) (Quillen dissenting); *Weinberger,* 457 A.2d at 703–04.

BERGER, Justice, with whom RIDGELY, President Judge, joins dissenting.

The majority's thorough and well reasoned decision reverses the trial court's equally thorough and well reasoned decision. According to the majority, the Court of Chancery did not err in its legal analysis, but in its evaluation of the facts—particularly with respect to the Special Committee members' independence, level of knowledge and involvement in the negotiations. The trial court recognized these issues and was satisfied, after six days of trial, that the Special Committee members were "informed, active and loyal to the interests of Tremont." That finding is supported by the record and should be accorded deference. I respectfully dissent.