**In re LNR PROPERTY CORP.
SHAREHOLDERS
LITIGATION.**

C.A. No. 674–N.

Court of Chancery of Delaware,
New Castle County.

Submitted: Oct. 11, 2005.
Decided: Nov. 4, 2005.
Revised: Dec. 14, 2005.

Norman M. Monhait, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE; Pamela S. Tikellis, Chimicles & Tikellis, L.L.P., Wilmington, DE; Merrill G. Davidoff, Glen L. Abramson, Michael C. Dell' Angelo, Berger & Montague, P.C.,

Philadelphia, PA; Jeffrey G. Smith, Demet Basar, Gustavo Bruckner, Wolf Haldenstein Adler Freeman & Herz, L.L.P., New York City; Richard Brualdi, Sue Lee, The Brualdi Law Firm, New York City, for the Plaintiffs.

Kenneth J. Nachbar, Morris Nichols Arsht & Tunnell, Wilmington, DE; Marty Steinberg, Jeffrey W. Gutchess, Hunton & Williams, L.L.P, Miami, FL; Michael D. Goldman, Stephen C. Norman, Potter Anderson & Corroon, L.L.P., Wilmington, DE; Howard G. Kristol, Matt Neiderman, Duane Morris, L.L.P., Wilmington, DE; James B. Weidner, Clifford Chance US, L.L.P., New York City; John R. Roellke, Jeffrey H. Drichta, Clifford Chance US, L.L.P., Washington, DC, for the Defendants.

### MEMORANDUM OPINION AND ORDER

LAMB, Vice Chancellor.

#### I.[1]

This is a purported class action against a Delaware corporation, its former directors, and its former controlling shareholder, alleging breach of fiduciary duty in connection with a cash-out merger pursuant to which the controlling stockholder and other members of management exercised the right to purchase a 25% equity stake in the surviving entity. Specifically, the complaint alleges that the directors breached their fiduciary duties when they allowed the purportedly conflicted controlling shareholder to negotiate (and later vote to authorize) the merger on terms that were inadequate and unfair to the public stockholders.

All defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted. The principal issue raised by the individual defendants' motion is whether the standard of the court's review in examining the complaint is the deferential standard of the business judgment rule or the more intrusive standard of entire fairness. Because the complaint (although strikingly bare-boned in character) adequately alleges facts that, if true, could support a reasonable inference that the controlling stockholder had a disabling conflict and, in essence, stood on both sides of the transaction, the court concludes that the entire fairness standard may apply. Because the court is required, when ruling on a motion made pursuant to Court of Chancery Rule 12(b)(6), to ignore most sources of information other than the complaint, the motion of the individual defendants to dismiss is denied.

#### A. The Parties

LNR Property Corporation is a Delaware corporation with its corporate headquarters located in Miami Beach, Florida. LNR is a real estate investment, finance, and management company which owns and manages properties.[2] As of May 30, 2004,

---

1. The facts recited in this opinion are taken from the well pleaded allegations of the complaint, unless otherwise noted, and are presumed to be true for the purpose of this motion. The court notes that the complaint selectively adopts facts from the company's proxy statement while leaving out many others that may prove to be determinative on a motion for summary judgment. For example, the court notes suggestions in the complaint that the challenged transaction arose in the context of a broader process undertaken by the defendant directors to seek a buyer for the company. Yet, the complaint portrays the challenged transaction as occurring in isolation. Of course, the facts relating to such broader sale process could well color the court's understanding of the issues raised by the complaint.

2. LNR owns and manages shopping centers, office buildings, industrial properties, hotels, apartment complexes, and undeveloped land zoned for commercial use.

LNR had 20,024,436 shares of common stock and 9,770,298 shares of Class B common stock outstanding.[3] The common stock had one vote per share while the Class B common stock, convertible share-for-share into common stock, had ten votes per share. LNR had a nine-member board of directors consisting of defendants Stuart A. Miller, Jeffrey P. Krasnoff, Brian L. Bilzen, Steven J. Saiontz, James M. Carr, Charles E. Cobb, Jr., Edward Thaddeus Foote, II, Stephen E. Frank, and Connie Mack. The complaint makes factual allegations attacking the independence of only four of the nine LNR directors. The other five (Carr, Cobb, Foote, Frank, and Mack) were presumably both disinterested and independent with respect to the challenged transaction.

Miller, LNR's controlling shareholder, was the chairman of the LNR board and beneficial owner of approximately 99.64% of LNR's outstanding Class B common stock and 2.71% of the company's common stock.[4] Miller beneficially owned 31% of the LNR equity and held 77.35% of the company's voting power. Krasnoff was the president and CEO of LNR.

The plaintiffs, George Caton, Aaron Brody, and Eastside Investors, LLP, are former owners of LNR common stock who were cashed out in the merger.

B. *The Sale Of LNR*

The complaint alleges that Miller and Krasnoff negotiated to sell LNR to Cerberus Capital Management L.P., a private investment firm, for $63.10 per share in cash.[5] As part of that same arrangement, Miller agreed to invest $150 million (approximately 25% of his cash proceeds) to acquire a 20.4% interest in the vehicle formed by Cerberus to effect that transaction. Similarly, Krasnoff and other members of LNR management agreed to invest approximately $34 million to acquire a 4.6% stake in that entity.

According to the complaint, the LNR board, which the plaintiffs allege was dominated and controlled by Miller, formed a Special Committee to evaluate the transaction,[6] but that committee

did not have authority either to engage in independent negotiations with Cerberus or Miller, or to pursue alternative transactions. Instead, the Special Committee was only permitted to review and approve [or disapprove] the merger on the terms negotiated by Miller and Krasnoff.[7]

The Special Committee retained its own counsel but chose Greenhill & Co., which had worked with Miller and Krasnoff in negotiating the terms of the deal, as its financial advisor.[8]

On August 29, 2004, LNR announced that its board of directors had unanimously agreed, upon the recommendation of the Special Committee, to the proposed $63.10 per share cash merger involving LNR, Cerberus, and the acquisition vehicle, Riley Property Holdings LLC.[9] The merger

---

3. Pl.'s Am. and Supp. Class Action Comp. ("Compl.") ¶ 9.

4. Compl. ¶ 10. Miller and his sister are trustees and beneficiaries of trusts that directly and indirectly owned the limited partnership interests in limited partnerships that owned 99.64% of the Class B common stock. Miller is the sole officer and director of the corporation that owns the general partner interests in those limited partnerships.

5. Compl. ¶¶ 1, 49.

6. Compl. ¶ 47.

7. Compl. ¶ 48.

8. Compl. ¶ 51.

9. Compl. ¶ 23.

was valued at $3.8 billion including equity and debt.[10] The merger agreement contained a no-shop provision, prohibiting the LNR board from soliciting any other bids.[11] In addition, "Miller and partnerships and trusts he and his family control entered into a voting agreement under which he agreed to vote their shares in favor of the merger as long as the LNR board or Special Committee continued to recommend the transaction."[12] On January 31, 2005, the stockholders (with Miller casting 77% of the voting power in favor) approved the transaction, which was consummated on February 3, 2005.[13]

As a result of the merger, Miller sold his 31% interest in the company for $586 million and then reinvested $150 million to purchase a 20.4% interest in Riley Property.[14] According to the complaint, "in effect, therefore, Miller sold 10.6% of his stock for a significant sum yet still retained the ability to participate in the Company's future profits and growth."[15] Miller also received $6.4 million for his options, a $4 million change in control premium payment, and $2.5 million in tax reimbursement payments. Family trusts affiliated with Miller received an additional $42.1 million in cash. In sum, the complaint alleges, Miller and entities affiliated with him received $491 million in cash and a 20.4% stake in Riley Property.[16]

In addition to their 4.6% equity stake in Riley Property, Krasnoff and other members of management allegedly received significant increases in their salaries and five-year employment contracts with Riley Property.[17] The complaint further alleges that, under the terms of the agreement, Krasnoff was to become CEO of Riley Property and receive a 150% increase in salary, from $500,000 to $1.25 million per year.[18]

## C. *The Complaint*

Within days of the announcement of the proposed transaction, three lawsuits were filed and were later consolidated. The defendants all answered, and the parties engaged in document and interrogatory discovery. The plaintiffs filed an amended and supplemental complaint in June 2005. That complaint makes bare-boned allegations about the negotiation of the transaction already described herein. It then contains extensive factual allegations intended to show the inadequacy or unfairness of the $63.10 price.[19] In fairly conclu-

---

10. Compl. ¶ 30.

11. Compl. ¶ 23. "The Merger Agreement prohibited LNR from soliciting any other bids, and permitted LNR to consider only unsolicited bids."

12. Compl. ¶ 2.

13. Compl. ¶ 52.

14. Compl. ¶¶ 1, 24.

15. *Id.*

16. Compl. ¶¶ 25–26.

17. Compl. ¶¶ 27–28. According to the complaint, Krasnoff and the management inves-

tors also received payments for options, significant control payments, and tax reimbursement payments. The complaint alleges that these individuals did not previously have employment contracts with LNR.

18. Compl. ¶ 50.

19. Compl. ¶¶ 31–42. The complaint alleges, among other things, that during the merger negotiations, LNR announced record earnings for its second quarter of 2004. "LNR's earnings per share were up 87% to $1.57, an all time high." In addition, the complaint alleges that the sale of a comparable company received a 33% market premium for its shares, which is greater than the 6.8% market premium received by LNR shareholders. Lastly, the plaintiffs allege that a financial

sory allegations, the complaint claims that Miller and LNR's other managers who invested in Riley Property acted in bad faith in pursuing a self-dealing transaction that "benefitted themselves at the expense of LNR's shareholders."[20] Using the obviously baseless assumption that Riley Property's equity value was equal to the value ascribed to LNR in the transaction, the complaint erroneously alleges that "Miller received for his LNR shares almost two-and-a-half times what the unaffiliated stockholders received for their shares."[21]

The complaint goes on to allege that the board of directors breached its fiduciary duties when it allowed "Miller and Krasnoff, parties with obvious and disabling conflicts of interest, to negotiate the Cerberus deal."[22] Similarly, the directors are charged with a breach of fiduciary duty in creating the Special Committee that was powerless and "did not have the authority either to engage in independent negotiations with Cerberus or Miller, or to pursue alternative transactions."[23]

Allegedly, the Special Committee and the board were dominated and controlled by Miller, resulting in a complete failure to protect the LNR shareholders.[24] Moreover, the plaintiffs allege that the Special Committee failed to get an independent evaluation of the value of the company, but instead relied on Greenhill & Co., which had worked with Miller and Krasnoff to negotiate the deal with Cerberus, and whose "$11 million compensation was

based entirely on occurrence of a transaction, giving it an incentive to support the [m]erger."[25]

The complaint also attacks the "lock-up" provisions in the merger agreement that allegedly prevented the LNR board from accepting other third-party competing bids.[26] The plaintiffs allege that (1) Miller entered into a voting agreement with Cerberus under which he agreed to vote his shares in favor of the merger,[27] and that (2) the merger agreement had a no-shop clause which prevented LNR from soliciting other bids.[28] The complaint does not allege that any other bidders emerged after the merger agreement was approved; nor does it allege that any such bidders were, in fact, discouraged by the lock-ups from entering the competition.

## D. Motions To Dismiss

On July 15, 2005, the defendants filed their opening brief in support of their motion to dismiss the amended and supplemental complaint in its entirety, arguing that the decision of the Special Committee and the LNR board to authorize the merger is protected by the business judgment rule. In large measure, the motion to dismiss is premised on the argument that Miller (and, less importantly, Krasnoff) had no disabling conflict of interest in the merger because, they argue, his incentive "was to obtain the highest possible price for his LNR shares, and he received the same $63.10 per share as did all LNR

analyst who followed LNR for three years stated publicly, "I don't like the price. I think the company is conservatively worth at least $70 a share."

20. Compl. ¶ 44.

21. Compl. ¶ 26.

22. Compl. ¶ 49.

23. Compl. ¶ 48.

24. Compl. ¶¶ 47–48.

25. Compl. ¶ 51.

26. Compl. ¶ 46.

27. Compl. ¶ 2.

28. Compl. ¶ 46.

shareholders."[29] In this regard, the defendants debunk the fallacious allegation that Miller's LNR shares sold for two and a half times the amount paid for the publicly held shares. Because this allegation is "demonstrably false" the defendants urge the court to conclude that there is no well pleaded basis on which to find that Miller was, in fact, a conflicted controller.[30] This conclusion is supported, they argue, by the fact that a clear majority of the directors were both disinterested and independent of Miller.

In their brief and at argument, the plaintiffs chose not to argue that this case is one in which the entire fairness standard applies *ab initio* as a result of Miller having stood on both sides of the deal. Rather, they argue that, although "the entire fairness standard does not apply automatically,"[31] entire fairness review will ultimately be necessary since the complaint adequately alleges that the directors breached their fiduciary duties of loyalty and care, thus implicating that harsh standard.

## II.

The standard for dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. A motion to dismiss will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading.[32] That determination is generally limited to the factual allegations contained in the complaint. In considering this motion, the court is required to assume the truthfulness of all well pleaded allegations of fact in the complaint.[33] All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true.[34] However, with that said, a trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in the plaintiff's favor unless they are reasonable inferences.[35]

## III.

A well settled precept of Delaware corporate law is that a fiduciary is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders.[36] This is founded on the belief that a fiduciary cannot be expected to exercise his or her independent business judgment without being influenced by the personal benefits resulting from the transaction.[37] "The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest."[38]

29. Def's Reply Br. at 12.

30. *Id.*

31. Pl's Answering Br. in Opp. to Def's Mot. to Dis. at 14.

32. *Kohls v. Kenetech Corp.*, 791 A.2d 763, 767 (Del.Ch.2000).

33. *Grobow v. Perot*, 539 A.2d 180, 188 n. 6 (Del.1988).

34. *Id.*

35. *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del.Ch.1999).

36. *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984) (Directors are interested if they "appear on both sides of a transaction or expect to derive any personal financial benefit from it in the sense of self-dealing as opposed to a benefit which devolves upon the corporation or all stockholders generally.").

37. *Id.*

38. *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

■ Particularly, when a controlling shareholder stands on both sides of a transaction, he or she is required to "demonstrate [his or her] utmost good faith and most scrupulous inherent fairness of the bargain." [39] Accordingly, in an interested cash-out merger transaction where the controlling shareholder is as much a buyer as a seller, "no court could be certain whether the transaction terms fully approximate what truly independent parties would have achieved in arm's length negotiation." [40] Therefore, the court adheres to a more exacting entire fairness standard of judicial review to protect the minority shareholders,[41] premised on the inapplicability of the business judgment rule "where self-interest may have colored directors' actions." [42]

■ The complaint can be read to allege that the board improperly allowed Miller, owning 77% of the voting power of the company and acting as a buyer and seller in the transaction, to control the negotiations with Cerberus, as well as the outcome of the vote, resulting in an unfair and inadequate price for the stock in the cash-out. According to the complaint,

> Miller personally negotiated a one-sided deal that allowed him and select members of management to continue to reap the benefits of LNR's future growth while cutting out plaintiff and the class. Miller exchanged his 31% interest in LNR shares for a 20.4% interest in the new company, thus enabling Miller to participate in the significant growth prospects of the Company going forward while selling only a fraction of his LNR shares and forcing out the public stockholders.[43]

Despite Miller's conflicts of interest, the complaint alleges, the board permitted Miller and Krasnoff to negotiate the terms of the merger.[44] Additionally, the complaint alleges that the board formed a "sham" Special Committee which "did not have the authority to engage in independent negotiations with Cerebrus or Miller,

**39.** *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983).

**40.** *Kahn v. Lynch Comm. Sys.*, 638 A.2d 1110, 1116 (Del.1994); *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 594–95 (Del.Ch.1986) (holding that the heightened judicial scrutiny called for by the test of intrinsic or entire fairness is applied when a controller has an interest with respect to the transaction that conflicts with the interest of the minority).

**41.** *Kahn*, 638 A.2d at 1115 ("A controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire fairness."); *Weinberger*, 457 A.2d at 710 (holding that when directors of a corporation are on both sides of the transaction, they must demonstrate the fairness of the bargain); *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del.1997) ("Ordinarily, in a challenged transaction involving self-dealing by a controlling shareholder the substantive legal standard is that of entire fairness."); *Emerald Partners v. Berlin*, 787 A.2d 85, 94 (Del.2001) ("Hall's stance on both sides as a corporate fiduciary, alone, is sufficient to require the demonstration of entire fairness."); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109–110 (Del. 1952) (holding that since the majority stockholder stood on both sides of the transaction, the directors bear the burden of establishing entire fairness); *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1279 n. 27 (Del. 1989) *citing AC Acquisitions v. Anderson, Clayton & Co.*, 519 A.2d 103, 111 (Del.Ch. 1986) ("where a self-interested corporate fiduciary has set the terms of a transaction and caused its effectuation, it will be required to establish the entire fairness of the transaction to a reviewing court's satisfaction.").

**42.** *Thorpe v. CERBCO*, 676 A.2d 436, 443 n. 9 (Del.1996).

**43.** Compl. ¶ 3.

**44.** Compl. ¶¶ 4, 49.

or to pursue alternative transactions."[45] The Special Committee was "only permitted to review and approve the merger as negotiated by Miller and Krasnoff."[46] Allegedly, Miller dominated and controlled the board and the Special Committee and coerced them into approving the deal even though the sale price was well below LNR's fair value.[47]

The defendants dispute in their briefs that this is a circumstance where a controlling shareholder stood on both sides of the transaction. They contend that Miller was not predominantly a buyer in the transaction, but rather a "net seller" of LNR shares, such that his interests were directly aligned with those of the other shareholders.[48] In effect, the defendants maintain that during the negotiations with Cerberus, Miller endeavored to secure the highest value reasonably attainable for the stockholders. Moreover, the defendants argue that, while the Special Committee's powers may have been limited, the transaction was approved by a majority of independent and disinterested board members.

■ The defendants are correct that the complaint does not adequately allege either self-interest or a lack of independence on the part of a majority of the LNR directors. Nevertheless, as already discussed, the business judgment rule does not protect the board's decision to approve a merger (even where a majority of the directors are independent and disinterested) where a controlling shareholder has a conflicting self-interest.[49] Instead, Delaware law imposes an entire fairness burden when the fiduciary charged with protecting the minority in a sale of the company does not have an undivided interest to extract the highest value for the shareholders.[50]

There is authority for the proposition that the mere fact that a controller has or may be acquiring some interest in the buyer does not automatically trigger entire fairness review. For example, in *Orman v. Cullman*, the court found that a controller who sold a portion of his interest to a third party while maintaining a controlling stake in the resulting corporation was sufficiently unconflicted so as to permit business judgment rule review of the transaction, where there was both an active special board committee with full bargaining power that actually negotiated the final terms of the transaction, and the

---

**45.** Compl. ¶ 48.

**46.** *Id.*

**47.** Compl. ¶¶ 31–42.

**48.** The defendants contend, and the court agrees, that the following allegation is demonstrably false:

> Miller received for his LNR shares almost two-and-a-half times what the unaffiliated stockholders received for their shares. In effect, Miller received proceeds of $491 million for selling a 10.6% ownership stake, which thus values the entire company at approximately $4.6 billion and each share at approximately $155. Compl. ¶ 26.

The fallacy in this allegation lies in its equation of what Miller sold (LNR stock) and what he bought (shares in Riley Property). There is no reason to assume that the capital structure of Riley Property, immediately after the closing of the transaction, looked anything like that of LNR immediately before. Thus, it would be illogical to draw any comparison between the value paid by Miller for 20.4% of Riley Property and the value obtained by him for selling 31% of LNR. The two are "apples and oranges," and nothing about one can be inferred from the other.

**49.** *Weinberger*, 457 A.2d at 710.

**50.** *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036 at *22 n. 12, 1989 Del. Ch. Lexis 9 at *40 n. 12 (Del.Ch.1989) (explaining that the entire fairness test is applied when a financially interested party sets the terms of a transaction and compels its effectuation).

merger agreement contained a majority of the minority vote condition.[51]

Here, Miller allegedly negotiated the merger transaction with Cerberus while also agreeing to acquire a substantial (20.4%) stake in the resulting company. Looking at only the bare bones of the complaint, the court cannot reasonably conclude from the facts alleged that Miller's interests were aligned with those of the stockholders. Instead, the well pleaded allegations in the complaint, if true, could support a reasonable inference that Miller was sufficiently conflicted at the time he negotiated the sale that he would rationally agree to a lower sale price in order to secure a greater profit from his investment in Riley Property. If this is shown to be the case, the transaction will be subject to entire fairness review.[52]

Of course, the defendants may be able to show at the summary judgment stage that Miller, as they argue, negotiated this transaction as a seller, not a buyer, and that the board and the Special Committee were entitled to repose confidence in his unconflicted motivation to obtain the maximum price for all LNR stockholders. In that case, the court may well be able to conclude that the measures taken by the board and the Special Committee to protect the interests of the minority were adequate in the circumstances to invoke the business judgment standard of review. Nonetheless, those facts and circumstances do not appear in the well pleaded allegations of the complaint.

## IV.

The defendants contend that the court should dismiss the plaintiffs' claims against the individual directors, arguing that those claims are barred by the exculpatory provisions of Section 102(b)(7). Such a charter provision bars any claim for monetary damages against director defendants based solely on the board's alleged breach of its duty of care, but does not provide protection against claims based on, *inter alia*, acts or omissions not in good faith and violations of the fiduciary duty of loyalty.[53] While the independent director defendants may ultimately be able to rely upon the Section 102(b)(7) charter provision, it is premature to dismiss the claims against them on this basis. First, the entire fairness standard of review may be applicable, and, thus, "the inherently interested nature of those transactions [may be] inextricably intertwined with issues of loyalty."[54] Second, the plaintiffs allege that the directors breached the duty of loyalty and acted in bad faith when they

**51.** 794 A.2d 5, 21–22, n. 36 (Del.Ch.2002); *see also In re Budget Rent A Car Corp. S'holders Litig.*, 1991 WL 36472 at *3, 1991 Del. Ch. Lexis 29 at *10 (Del. Ch.1991).

**52.** *Weinberger*, 457 A.2d at 711; *Kahn*, 638 A.2d at 1117; *Tremont*, 694 A.2d at 430–431. The test of fairness has two aspects: fair dealing and fair price. The element of fair dealing focuses on the conduct of the corporate fiduciaries in effectuating the transaction. The court looks to how the purchase was initiated, negotiated, structured, and the manner in which director approval was obtained. The price element relates to the economic and financial considerations relied on when valuing the purchase price. While the initial burden of establishing entire fairness rests on the defendant party, an approval of the transaction by an independent and disinterested board or Special Committee, as well as an informed majority of minority vote, shifts the burden of proof on the issue of fairness to the challenging shareholder plaintiffs.

**53.** *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del.2001).

**54.** *Emerald Partners*, 787 A.2d at 93–98. (explaining that the court should address the Section 102(b)(7) charter provision only after it makes a determination that the challenged transaction was not entirely fair).

approved the merger. While the insubstantial nature of the complaint's allegations challenging the independence of a majority of the directors undermines this claim, the court need not resolve the issue at this time, given the unresolved standard of review. Accordingly, the individual defendants' motion to dismiss on the basis of LNR's exculpatory charter provision must be denied without prejudice.

 Lastly, the defendants argue that LNR is not a proper defendant in this case. The complaint does not allege any wrongdoing by LNR but only breaches of fiduciary duties against the individual director defendants.[55] Nor does the complaint seek any reasonable form of relief, such as an injunction or rescission, which requires LNR to be joined as a defendant. Having allowed the merger to close without seeking an injunction, the plaintiffs cannot now seek, and they do not argue to the contrary, to rescind and set aside the merger.[56] Therefore, the claims against LNR are dismissed.

## V.

For the foregoing reasons, LNR's motion to dismiss pursuant to Rule 12(b)(6) is GRANTED and the motion of the individual defendants to dismiss is DENIED. IT IS SO ORDERED.

---

**55.** *Arnold v. Society for Sav. Bancorp*, 678 A.2d 533, 539 (Del.1996) ("Holding the corporation vicariously liable for the directors' breach of a fiduciary duty would be flatly inconsistent with the rationale of vicarious liability since it would shift the cost of the directors' breach from the directors to the corporation and hence to the shareholders, the class harmed by the breach."); *In re Dataproducts Corp. S'holders Litig.*, 1991 WL 165301 at *6, 1991 Del. Ch. Lexis 149 at *19 (Del.Ch.1991) ("a corporation qua corporate

entity is not a fiduciary of, and thus cannot owe a fiduciary duty to, its shareholders.").

**56.** *Winston v. Mandor*, 710 A.2d 831 (Del.Ch. 1996) (holding that where the circumstances of a challenged transaction make rescission infeasible, and where the plaintiff is not unfairly prejudiced, a motion to dismiss that remedy may be granted).