# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

<table>
<tr><td>
ROOFERS LOCAL 149 PENSION<br>
FUND, derivatively on behalf of<br>
Nominal Defendant F&G ANNUITIES<br>
& LIFE, INC.,<br>
<br>
        Plaintiff,<br>
<br>
  v.<br>
<br>
FIDELITY NATIONAL FINANCIAL,<br>
INC. and WILLIAM P. FOLEY,<br>
<br>
        Defendants,<br>
<br>
    and<br>
<br>
F&G ANNUITIES & LIFE, INC., a<br>
Delaware corporation,<br>
<br>
        Nominal Defendant.
</td>
<td>
)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)
</td>
<td>C.A. No. 2024-0562-LWW</td>
</tr>
</table>

## MEMORANDUM OPINION

Date Submitted: February 4, 2025
Date Decided: May 9, 2025

Ned Weinberger & Mark Richardson, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware; Guillaume Buell, John Vielandi, Nina Varindani & Joshua M. Glasser, LABATON KELLER SUCHAROW LLP, New York, New York; Jeremy S. Friedman, David Tejtel & David Rosenfeld, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; Lyndsey Bates, ASHERKELLY, Southfield, Michigan; *Counsel for Plaintiff Roofers Local 149 Pension Fund*

Michael A. Barlow & Hayden J. Driscoll, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Michael B. Carlinsky, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Counsel for Defendants Fidelity National Financial, Inc. and William P. Foley*

**WILL, Vice Chancellor**

This case challenges a $250 million capital investment by a controlling stockholder in exchange for preferred stock. The transaction was negotiated between the controlling stockholder and a fully empowered special committee of disinterested directors. The special committee and its independent advisors determined that the investment was in the company's best interest and on terms equal to or better than those available in the public markets.

The stockholder plaintiff asserts that the transaction was a breach of the controlling stockholder's duty of loyalty and cannot satisfy the entire fairness standard. Although related-party deals with controlling stockholders carry risks, they are not inherently wrongful under Delaware law. They are permissible if they are fair. Thus, a plaintiff wishing to challenge such a transaction must meet its pleading-stage burden of alleging facts demonstrating unfairness.

The plaintiff here falls short—particularly as to fair price. It neglects to identify any term of the investment that was unfair or even sub-market. It merely questions whether the company should have taken on debt or sold equity to a third party instead. Speculation about alternative capital raising options does not suggest that the transaction lacks substantive fairness.

This case is therefore dismissed for failure to state a claim.

# I. BACKGROUND

Unless otherwise noted, the following facts are drawn from the Verified Stockholder Derivative Complaint and documents it incorporates by reference.[1]

## A. F&G's History

Fidelity National Financial, Inc. ("FNF") is a publicly traded Delaware corporation founded by William P. Foley.[2] It provides title insurance, escrow, and transaction services to the real estate and mortgage industries.[3] Foley has served as the Chairman of FNF's board of directors since 1984.[4]

In 2022, FNF spun off its wholly owned subsidiary F&G Annuities & Life, Inc. ("F&G" or the "Company") as a Delaware corporation.[5] FNF distributed, on a

---

[1] Verified S'holder Deriv. Compl. (Dkt. 1) ("Compl."); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint . . . .").

Documents attached to the Transmittal Affidavits of Hayden J. Driscoll in Support of Defendants' Opening Brief in Support of Their Motion to Dismiss Plaintiff's Verified Stockholder Derivative Complaint (Dkt. 11) and of Defendant's Reply Brief in Further Support of its Motion to Dismiss Plaintiff's Verified Stockholder Derivative Complaint (Dkt. 20) are cited as "Defs.' Ex. __." Certain of those exhibits were produced to the plaintiff in response to a books and records demand under 8 *Del. C.* § 220 and incorporated by reference into the Complaint by agreement of the parties. Defs.' Ex. A (Confidentiality Agreement) § 2(g); *see also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016*)*. Pincites refer to internal pagination or, where it is lacking, the last three digits of the Bates stamps.

[2] Compl. ¶¶ 10-11.

[3] *Id.* ¶ 10.

[4] *Id.* ¶ 11.

[5] *Id.* ¶ 23.

2

pro rata basis, about 15% of F&G's common stock to FNF's stockholders.[6] It retained approximately 85% of F&G's outstanding common stock.[7] After the spin-off, F&G operated FNF's pre-separation annuities and life insurance segment, while FNF continued to own and operate its remaining businesses.[8]

F&G has an eight-member board of directors (the "Board"). Foley has served as the Board's Executive Chairman since 2022.[9] Four other Board members are dual fiduciaries of F&G and FNF or longtime associates of Foley.[10] The fifth director is F&G's CEO.[11]

## B. FNF's Potential Investment

During a November 7, 2023 meeting, the Board discussed capital raising for F&G, including the possibility of FNF investing up to $250 million.[12]

Due to "potential conflicts of interest," the Board formed a Special Committee to evaluate a "Potential Transaction," defined as "a potential capital raising

---

[6] *Id.*

[7] *Id.* ¶ 25. FNF had about 84% of F&G's outstanding stock when the Complaint was filed. *Id.* ¶ 26.

[8] *Id.* ¶ 24.

[9] *Id.* ¶ 11.

[10] *Id.* ¶¶ 13-16, 30-36.

[11] *Id.* ¶ 17.

[12] *Id.* ¶ 39; *see* Defs.' Ex. B ("Nov. 7 Board Minutes").

3

transaction by F&G."[13]  The Board delegated to the Special Committee the complete "power and authority to (1) review and evaluate the terms and conditions of a Potential Transaction . . . (2) reject any Potential Transaction . . . and (3) determine whether or not to approve a Potential Transaction, and on what terms and conditions."[14]  The Special Committee's process and decision-making was to be guided by its assessment of "the best interests of the holders of the common stock of F&G other than FNF."[15]  It was also given the authority to hire outside advisors.[16]

The Special Committee was composed of two disinterested directors.[17]  They would receive "a flat fee in an amount to be subsequently determined" for the "additional responsibilities" of their Special Committee service.[18]

Six days later, on November 13, F&G and FNF each announced FNF's intent to invest approximately $250 million in F&G.[19]  In twin press releases, they

---

[13] Nov. 7 Board Minutes '734 (defining "Potential Transaction").

[14] *Id.* at '735 (cleaned up).

[15] *Id.*

[16] *Id.*

[17] Compl. ¶¶ 39-40.  It is undisputed that these directors are independent of FNF and Foley.

[18] Nov. 7 Board Minutes '735; Compl. ¶ 40.

[19] Compl. ¶ 41; *see* Defs.' Ex. E ("F&G Nov. 13 Press Release"); *see also* Press Release, Fidelity National Financial, Fidelity National Financial, Inc. Announces Intent to Invest Approximately $250 Million In Majority-Owned Subsidiary F&G (Nov. 13, 2023), https://www.investor.fnf.com/node/25971/pdf ("FNF Nov. 13 Press Release").  The FNF press release is not mentioned in the Complaint.  I take judicial notice of it.  *See In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to

disclosed that the transaction was "expected to close in late 2023 or early 2024, subject to customary closing conditions."[20] The press releases also announced the formation of the Special Committee.[21]

## C. The Beginning of the Process

The Special Committee held its first meeting on November 30. Members of Company management and the Special Committee's advisors from Barclays and Sullivan & Cromwell LLP attended.[22] The Special Committee members discussed that "Foley [had] agreed to provide [them] with reasonable compensation" for their service, "which [wa]s being finalized."[23]

During the meeting, F&G's CEO told the Special Committee that FNF would soon provide a term sheet for a proposed investment.[24]

## D. The Special Committee's Negotiations

The Special Committee met nine more times.[25] Several meetings are notable.

---

reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))).

[20] F&G Nov. 13 Press Release; FNF Nov. 13 Press Release; *see* Compl. ¶ 41.

[21] F&G Nov. 13 Press Release; FNF Nov. 13 Press Release; *see* Compl. ¶ 41.

[22] Compl. ¶ 43. Barclays was not officially engaged until December 14. *Id.* ¶ 51. Its compensation was, in part, contingent upon the consummation of a transaction. *See Id.* ¶¶ 50-51; *see also infra* note 90 and accompanying text.

[23] Compl. ¶ 45.

[24] *Id.* ¶ 44.

[25] *Id.* ¶¶ 46, 50-52, 54-56, 58-60 (describing meetings on December 11, 13, 15, 18, 20, 21, and 22, 2023, and on January 4 and 11, 2024).

On December 11, the Special Committee met to discuss a "revised version of [a] term sheet circulated by FNF" three days earlier.[26] The proposal involved the issuance of mandatory convertible preferred stock to FNF. FNF initially proposed that the preferred stock bear a 6.5% dividend rate and a 10% conversion premium.[27]

The Special Committee also considered alternative capital-raising transactions including issuing "equity rather than debt" or "convertible preferred equity in the private rather than public market."[28] It concluded that, "[g]iven the recent increase in the price of F&G's common stock," it would be beneficial for F&G to raise equity capital.[29] The issuance of mandatory convertible preferred equity in particular would minimize dilution.[30]

---

[26] *Id.* ¶ 46; *see* Defs.' Ex. H ("Dec. 11 Special Committee Minutes").

[27] Compl. ¶ 48. Under this proposal, the price at which the shares would convert to common stock would be 10% over the reference price—typically the market price of common stock as of issuance. A higher conversion premium would mean that the preferred stock converted to common stock at a greater price, requiring fewer shares. The dividend rate on preferred stock functions like the coupon rate on a bond, paying a fixed percentage of the par value of the stock on a regular interval. *See* Nasdaq, *What Are Preferred Dividends?*, https://www.nasdaq.com/articles/what-are-preferred-dividends (last visited May 7, 2025). Under this proposal, FNF would receive 6.5% of par value on a quarterly basis. A higher dividend rate would require F&G to pay a greater amount to investors in the preferred stock.

[28] Compl. ¶ 49.

[29] Dec. 11 Special Committee Minutes '186.

[30] *Id.* ("[T]he issuance of [p]referred [s]tock would enable F&G to strengthen its balance sheet with additional equity capital on favorable pricing terms while minimizing dilution to holders of its common stock.").

On December 15, the Special Committee explored whether it should transact with FNF privately or proceed with a public market offering.[31]  Barclays advised that focusing on FNF would be preferable for two reasons.  First, hedge funds would likely be unwilling to participate in a public deal given the low levels of publicly traded F&G stock.[32] And, second, it would allow for a quick process, which was important given the volatility of F&G's stock price.[33]  But "[a]ll agreed that any [p]referred [s]tock transaction with FNF must proceed on terms at least as favorable as those that could be obtained in a public market deal."[34]

The Special Committee decided to submit a counteroffer to FNF.[35]  Barclays later presented FNF with a counteroffer of a 6.5% dividend rate and a 20% conversion premium.[36]

At the next meeting on December 18, Barclays reported that FNF had rejected the Special Committee's counteroffer and made a second offer: a 7.5% dividend rate

---

[31] Defs.' Ex. I ("Dec. 15 Special Committee Minutes") '203; Compl. ¶ 52.

[32] Dec. 15 Special Committee Minutes '203.

[33] *Id.*

[34] *Id.*

[35] Compl. ¶ 52; *see* Dec. 15 Special Committee Minutes '203 (stating that the counteroffer discussed was a 6.5% dividend rate and a 17.5% conversion premium.

[36] Defs.' Ex. F ("Dec. 18 Special Committee Minutes") '205 ("[Barclays] reminded the Special Committee that [it] presented FNF a counteroffer of a 6.5% dividend rate and 20% conversion premium on December 15, 2023.")

and 17.5% conversion premium.[37] Barclays told the Special Committee that, by its analysis, "a dividend rate of 6.5% and conversion premium of 10%, benchmarked to the market price of F&G's [c]ommon [s]tock, roughly reflected fair value."[38] Barclays also noted that if a comparable preferred stock transaction were offered in the public market, it "would expect equivalent pricing terms to be substantially less favorable to F&G due to the stock price impact (or 'slippage') of the announced transaction, and would expect the size of the issuance to be smaller."[39]

Two days later, on December 20, Barclays again "reiterated [its] view" to the Special Committee "that F&G would not likely be able to issue $250 million in preferred stock in the public market on terms equal to those being offered by FNF."[40] Still, the Special Committee declined FNF's second offer. It instead proposed a counteroffer of a 6.5% dividend rate and a 17.5% conversion premium.[41]

On December 21, FNF rejected the Special Committee's proposal and countered with its third offer: a 7% dividend rate and 17.5% conversion premium.[42]

---

[37] *Id.*; *see* Compl. ¶ 54.

[38] Dec. 18 Special Committee Minutes '205.

[39] *Id.*; *see also id.* at '219.

[40] Defs.' Ex. G ("Dec. 20 Special Committee Minutes") '235; *see* Compl. ¶ 55.

[41] Dec. 20 Special Committee Minutes '235.

[42] Defs.' Ex. K ("Dec. 21 Special Committee Minutes") '242; *see also* Compl. ¶ 56 ("On December 21, 2023, Barclays informed the Special Committee of FNF's rejection of F&G's counterproposal of a 6.5% dividend rate due to the purported 'elevated rate environment.'").

The Special Committee rejected this offer and countered with a 6.75% dividend rate and 17.5% conversion premium.[43]

The next day, on December 22, FNF made its fourth offer: a 6.875% dividend rate and a 17.5% conversion premium.[44] Barclays opined that these terms "would be favorable to F&G as compared to a similar transaction in the public market."[45] The Special Committee directed Barclays to accept the offer on an "informal handshake basis."[46] It also resolved to include a "Certificate of Designations" requirement, under which only a committee of independent Board members could declare and pay dividends, purchase or redeem preferred stock, and alter key terms.[47]

FNF's proposal used a 20-day Volume Weighted Average Price (VWAP) as a reference price.[48] The Special Committee asked Barclays to analyze the effect of using a VWAP rather than a fixed reference price before deciding whether to accept

---

[43] Dec. 21 Special Committee Minutes '242.

[44] Defs.' Ex. L ("Dec. 22 Special Committee Minutes") '244; *see* Compl. ¶ 58.

[45] Dec. 22 Special Committee Minutes '244.

[46] Compl. ¶ 58 (quoting Dec. 22 Special Committee Minutes '244).

[47] Dec. 22 Special Committee Minutes '244.

[48] Compl. ¶ 58. "The VWAP is a popular benchmark that accounts for both volume and price to reflect the average price a security trades at throughout the day." *Brown v. Matterport, Inc.*, 2024 WL 2745822, at *20 (Del. Ch. May 28, 2024), *aff'd, rev'd in part on other grounds*, *Matterport, Inc. v. Brown*, -- A.3d --, 2025 WL 1166116 (Del. Apr. 22, 2025) (TABLE). To calculate VWAP, for each day in the reference period, the numerator is the share price (an average of the high, low, and closing prices for the day) multiplied by shares outstanding, and the denominator is the shares outstanding. *See, e.g.*, Investopedia, *Volume-Weighted Average Price (VWAP): Definition and Calculation* (July 12, 2024), https://www.investopedia.com/terms/v/vwap.asp.

that part of FNF's offer.[49]   On January 11, 2024 both sides agreed to a $45.00 reference price, consistent with the Special Committee's initial proposal.[50]

### E.    The Final Transaction

Under the final negotiated terms, FNF invested $250 million into F&G in exchange for five million shares of newly-created Series A mandatory convertible preferred stock (the "Transaction").[51]   The preferred stock bore a 6.875% dividend rate, payable in cash or common stock.[52]   The final conversion rate ranged from 0.9456x to 1.1111x depending on the value of F&G's common stock at conversion, reflecting a collar between $45.00 and $52.88 per share.[53]   The preferred stock will be mandatorily converted three years from issuance, on January 15, 2027.[54]

---

[49] Compl. ¶ 58; Dec. 22 Special Committee Minutes '244 ("It was further agreed that Barclays would run another analysis of the stock price using a 20-day volume-weighted average price and confirm with members of the Special Committee whether they wish to accept [FNF]'s proposal to use a 20-day volume-weighted average price or to propose a fixed reference price of approximately $45.00.").

[50] Compl. ¶ 60.  By comparison, the 20-day VWAP as of January 11, 2024 was $43.64. On December 22, 2023—the date of FNF's prior offer—the 20-day VWAP was $45.21. *See* Yahoo! Finance, F&G Annuities & Life, Inc. (FG), https://finance.yahoo.com/ quote/FG/history/?period1=1701388800&period2=1705017600 (last visited May 7, 2025); *see also Lee v. Pincus*, 2014 WL 6066108, at *4 n.11 (Del. Ch. Nov. 14, 2014) (explaining that the court may take judicial notice of stock prices on a motion to dismiss "because they are not subject to reasonable dispute").

[51] Compl. ¶ 62.

[52] *Id.* ¶ 63.  To the extent F&G chooses to make such payments in stock, the share price to which the dividend rate applies is 97% of the five-day VWAP.  *Id.*

[53] *Id.* ¶ 64.

[54] *Id.* ¶ 63.

On January 12, Barclays issued its "opinion with respect to the commercial reasonableness of the financial terms of the [p]roposed Transaction."[55]  It explained that it had considered information including the proposed Transaction terms, F&G management's projections, trading history, comparable companies and transactions, and "alternatives available to the Company on a stand-alone basis to fund its future capital and operating requirements."[56]  It concluded that "the financial terms of the [p]roposed Transaction are commercially reasonable to the Company."[57]

The same day, the parties executed a Subscription Agreement for the Transaction.[58]

### F.  This Litigation

Several months later, in May 2024, Roofers Local 149 Pension Fund—a beneficial owner of F&G common stock—filed this lawsuit derivatively on F&G's behalf.[59]  Its Complaint advanced two counts, both challenging the fairness of the Transaction to the Company.  Count I is a breach of fiduciary duty claim against

---

[55] Defs.' Ex. M ("Barclays Op.") '156; *see* Compl. ¶ 59 (discussing the Special Committee's request that language "indicating that the letter did not constitute a fairness opinion be removed").

[56] Barclays Op. '156.

[57] *Id.* at '157.

[58] Defs.' Ex. N.

[59] Compl. ¶ 9.

FNF as F&G's controlling stockholder.[60] Count II is a breach of fiduciary duty claim against Foley for using his "dual fiduciary positions" to "cause F&G to enter into the unfair [Transaction]."[61]

FNF and Foley moved to dismiss the Complaint on July 24.[62] The plaintiff then voluntarily dismissed Foley from the suit.[63] Briefing on FNF's motion to dismiss was complete as of September 24.[64] Oral argument on the motion to dismiss was held on February 4, 2025.[65] I took the motion under advisement at that time.

## II.    ANALYSIS

FNF moves to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim on which relief can be granted.[66] The motion is governed by the reasonable conceivability standard:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the "plaintiff would not

---

[60] *Id.* ¶¶ 83-88.

[61] *Id.* ¶ 91; *see id.* ¶¶ 89-93.

[62] Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Pl.'s Verified S'holder Deriv. Compl. (Dkt. 11) ("Defs.' Opening Br.").

[63] Dkt. 18.

[64] *See* Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss Verified S'holder Deriv. Compl. (Dkt. 17) ("Pl.'s Answering Br."); Def.'s Reply Br. in Further Supp. of Its Mot. to Dismiss Pl.'s Verified S'holder Deriv. Compl. (Dkt. 20) ("Def.'s Reply Br.").

[65] Dkts. 28-29.

[66] Ct. Ch. R. 12(b)(6).

be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[67]

I "must draw reasonable inferences in favor of the plaintiff" but am "not required to accept every strained interpretation of its allegations."[68] Nor must I accept conclusory statements "unsupported by allegations of specific facts."[69]

## A. The Entire Fairness Standard

The sole remaining claim is for breach of fiduciary duty against FNF as the Company's controlling stockholder. The plaintiff contests the "paradigmatic conflicted controller transaction" through which FNF secured $250 million in F&G preferred stock.[70] It argues that, because the Transaction was not conditioned on a vote of F&G's minority stockholders, the entire fairness standard of review applies.[71]

The application of entire fairness typically "will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss."[72] "Entire fairness is not, however,

---

[67] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citation omitted).

[68] *Gen. Motors (Hughes)*, 897 A.2d at 168 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)).

[69] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000).

[70] Pl.'s Answering Br. 1.

[71] *E.g.*, *id.*; Compl. ¶¶ 4, 38.

[72] *Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002).

a free pass to trial."[73]  The plaintiff still must meet its pleading burden by "alleg[ing] some facts which if true would render the transaction unfair."[74]

To meet that pleading burden, it is not enough to say that a transaction is a conflicted one between a company and its controlling stockholder.  A conflict of interest "is not in itself a crime or a tort or necessarily injurious to others."[75]  Conflicted controller transactions "are perfectly acceptable if they are entirely fair, and so a plaintiff must allege facts that demonstrate a lack of fairness."[76]  If the plaintiff fails to do so, it has not stated a claim.[77]

---

[73] *In re Hennessy Cap. Acq. Corp. IV S'holder Litig.*, 318 A.3d 306, 319 (Del. Ch. 2024) (dismissing under Rule 12(b)(6) a claim subject to entire fairness review where the plaintiff failed to meet its pleading burden), *aff'd*, 2024 WL 5114140 (Del. 2024) (TABLE).

[74] *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *6 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996); *see also Monroe Cnty. Emps.' Ret. Sys. v. Carlson*, 2010 WL 2376890, at *2 (Del. Ch. June 7, 2010) ("Delaware law is clear that even where a transaction between the controlling shareholder and the company is involved—such that entire fairness is in play—plaintiff must make factual allegations about the transaction in the complaint that demonstrate the absence of fairness."); *HUMC Holdco, LLC v. MPT of Hoboken TRS, LLC*, 2022 WL 3010640, at *21 (Del. Ch. July 29, 2022) (dismissing an entire fairness claim where the plaintiff failed to plead facts to support an inference of unfairness, and noting that "the entire fairness standard of review does not raise the pleading standard required by Rule 8(a) or Rule 12(b)(6)").

[75] *In re Match Grp. Inc. Deriv. Litig.*, 315 A.3d 446, 461 (Del. Ch. 2024) (observing that "having a conflict of interest is not something one is guilty of" (cleaned up)).

[76] *Monroe Cnty.*, 2010 WL 2376890, at *2; *see also Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993) ("Application of the entire fairness rule does not . . . always implicate liability of the conflicted corporate decision maker, nor does it necessarily render the decision void.").

[77] *See Solomon*, 1995 WL 250374, at *6.

## B. Entire Fairness Allegations

There are two components to the "unitary" entire fairness standard: fair dealing and fair price.[78] Because the test is not a bifurcated one, a plaintiff must allege facts supporting a reasonable inference of both unfair price and unfair dealing. The failure to adequately plead either warrants dismissal.[79]

### 1. Fair Dealing

"The element of 'fair dealing' focuses upon the conduct of the corporate fiduciaries in effectuating the transaction."[80] It concerns "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[81] The plaintiff attempts to invoke several of these factors.

Its lead argument is that "the Board elected to eschew the roadmap set forth in *MFW*" because the Transaction was not conditioned on a majority of the minority vote.[82] In the plaintiff's view, this choice "beg[s] the question of *why*" no vote was

---

[78] *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667, 700 (Del. 2023) ("Entire fairness is a unitary test, and both fair dealing and fair price must be scrutinized by the Court of Chancery."); *see also Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

[79] *See Monroe Cnty.*, 2010 WL 2376890, at *2 (dismissing a claim where the plaintiff pleaded unfair dealing but made no allegations aimed at unfair price).

[80] *Kahn v. Tremont Corp.*, 694 A.2d 422, 430 (Del. 1997).

[81] *Weinberger*, 457 A.2d at 711.

[82] Pls.' Answering Br. 19 (discussing *In re MFW S'holders Litig.*, 67 A.3d 496 (Del. Ch. 2013), *aff'd*, 88 A.3d 635 (Del. 2014)); Compl. ¶ 38.

15

required "if the Transaction process was as pristine . . . as [the] [d]efendants claim."[83] Yet the decision to forgo an optional vote is not indicative of wrongdoing or unfairness.[84]

The plaintiff's other complaints are largely trivial.[85] Some have nothing to do with conduct by FNF—the sole remaining defendant in this case. Only one has some conceivable merit.

The plaintiff contends that setting the Special Committee's compensation well into the process created "improper incentive[s] . . . to approve a deal to FNF/Foley's satisfaction."[86] But it cannot fairly be inferred that the promise of a "flat fee in an amount to be subsequently determined" for the "additional responsibilities of committee service" was disabling.[87] Before delivering its first counteroffer, the

---

[83] Pl.'s Answering Br. 19 (emphasis added).

[84] Our legislature recently amended 8 *Del. C.* § 144 to provide that controlling stockholder transactions outside the going private context "may not be the subject of equitable relief" or damages if the transaction is approved either (1) "in good faith and without gross negligence" by a board committee of at least two disinterested directors, or (2) "by an informed, uncoerced, affirmative vote of a majority of the votes cast by the disinterested stockholders." 8 *Del. C.* § 144(b). Newly amended Section 144 does not apply to this case, which was filed before the legislation was introduced. If it applied, the defendants likely would have moved to dismiss based upon the safe harbor in Section 144(b)(1).

[85] *See* Def.'s Reply Br. 18-29 (addressing the plaintiff's process-related arguments).

[86] Pl.'s Answering Br. 20.

[87] *See supra* note 18 and accompanying text; *Se. Pa. Transp. Auth. v. Volgeneau*, 2013 WL 4009193, at *13-15 (Del. Ch. Aug. 5, 2023) (rejecting an argument that the failure to set a compensation arrangement for a special committee upfront rendered the committee conflicted in approving a transaction with a controlling stockholder), *aff'd*, 91 A.3d 562 (Del. 2014) (TABLE).

Special Committee demanded that its fees "be finalized prior to any further conversations with FNF."[88]

The plaintiff insists that making Barclays' compensation partly contingent on closing a transaction created another flaw in the Special Committee's process.[89] Contrary to the plaintiff's view, Delaware courts recognize that contingent fee arrangements for financial advisors are routine and often appropriate.[90] Barclays' arrangement provides no basis to look askance at its motives since it would be paid if "*any* transaction" involving a "material interest in [F&G]" closed.[91]

The plaintiff also questions Barclays' independence from FNF.[92] The Court of Chancery "has previously held, in a variety of circumstances, that a financial advisor's prior dealings with a counterparty to a transaction, standing alone, will not be adequate to plead a conflict of interest."[93] So too here. Barclays told the Special Committee that, though it "performed various investment banking services for

---

[88] Defs.' Ex. D ("Dec. 13 Special Committee Minutes") '201.

[89] Pl.'s Answering Br. 21-22 & n.93 (citing *Firefighters' Pension Sys. of Kan. City, Mo. Tr. v. Found. Bldg. Mat'ls, Inc.*, 318 A.3d 1105, 1172-73 (Del. Ch. 2024)).

[90] *See, e.g.*, *In re Alloy, Inc. S'holder Litig.*, 2011 WL 4863716, at *11 (Del. Ch. Oct. 13, 2011) (recognizing that contingent fees are "undoubtedly routine"); *see also Morrison v. Berry*, 2019 WL 7369431, at *16 n.231 (Del. Ch. Dec. 31, 2019) ("Delaware case law generally recognizes the efficiency and mundanity of the contingent fee structure.").

[91] Defs.' Ex. J (Barclays' Engagement Letter) '397.

[92] Pl.'s Answering Br. 22.

[93] *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at *22 n.104 (Del. Ch. Aug. 18, 2017).

[F&G] and FNF in the past and expect[ed] to perform such services in the future," it had "not received investment banking fees from FNF in the past two years."[94]

The plaintiff further asserts that the Special Committee's process was unfair because it "hardly considered" alternatives.[95] Minutes from multiple meetings where capital raising options were discussed by the Special Committee and Barclays bely this notion.[96]

The plaintiff's strongest argument involves the press releases issued by FNF and F&G on November 13.[97] Although the press releases explained that the Special Committee would "evaluat[e] and negotiat[e] [the] terms for the investment," they also told the market that F&G had committed to a $250 million investment by its controlling stockholder.[98] They announced that F&G "intended to enter into an agreement under which [FNF] *will* make an investment of approximately $250 million in F&G."[99] The press releases also said that "net proceeds from the

---

[94] Barclays Op. 2.

[95] Pl.'s Answering Br. 21.

[96] *See supra* notes 28-33, 39-40, and accompanying text.

[97] Pl.'s Answering Br. 19-20.

[98] F&G Nov. 13 Press Release ("The Special Committee, consistent with its fiduciary duties and in consultation with its independent financial and legal advisors, will thoroughly evaluate the terms and conditions of the investment on an arm's length basis."); *see* FNF Nov. 13 Press Release (same).

[99] F&G Nov. 13 Press Release (emphasis added); *see* Compl. ¶ 41; FNF Nov. 13 Press Release.

investment *will* be used to support the growth as [F&G's] assets under management."[100] They even noted that the investment was "expected to close in late 2023 or early 2024."[101]

The timing of these disclosures is curious. The press releases were issued six days after the Board first discussed a potential investment from FNF, and before the Special Committee held its first meeting.[102] It is reasonable to infer from these early public statements that FNF pressed the Company to pre-commit to a deal with it.[103]

Even if these facts were enough to infer unfair dealing by FNF, the plaintiff fails to state a breach of fiduciary duty claim. The Complaint lacks any well-pleaded allegations suggesting that the Transaction price was unfair. I address that deficiency next.

### 2. Fair Price

Fair price "relates to the economic and financial considerations of the proposed [transaction]."[104] This "is often the paramount consideration" in an entire

---

[100] F&G Nov. 13 Press Release (emphasis added); *see* Compl. ¶ 41; FNF Nov. 13 Press Release.

[101] Compl. ¶ 41.

[102] *Id.*

[103] The Special Committee's broad authority, and fact that it explored alternatives, support the competing inference. *See supra* notes 14-16, 28, 31, and accompanying text. At the pleading stage, however, the press releases support a reasonable plaintiff-friendly inference that the Transaction was preordained by FNF. *See supra* note 67 and accompanying text (quoting *Savor*, 812 A.2d at 896-97).

[104] *Weinberger*, 457 A.2d at 711.

19

fairness analysis "because a fair price is more likely to follow fair dealing."[105]  The failure to plead facts showing the absence of a fair price is fatal to an entire fairness claim, irrespective of a plaintiff's fair dealing allegations.[106]

FNF argues that the plaintiff has not met its pleading-stage burden to advance allegations showing that the Transaction's terms were unfair to the Company.[107]  In response, the plaintiff insists that its "Complaint is replete with well-supported allegations of price unfairness."[108]  A review of the Complaint reveals otherwise.

First, the plaintiff alleges that the Transaction was unfair because it "require[d] F&G to pay substantial annual dividends to FNF while the [p]referred [s]tock remains outstanding and allows FNF to convert the [p]referred [s]tock into common shares."[109]  This is a mere summary of how the mandatory convertible preferred stock offering worked.  It says nothing about the substantive fairness of the Transaction.

---

[105] *Monroe Cnty.*, 2010 WL 2376890, at *2.

[106] *Id.* at *2 (explaining that the failure to allege facts showing that the price is unfair is fatal to entire fairness claims "even if plaintiff's factual allegations prove unfair dealing"); *see also Del. Open MRI Radiology Assocs., PA. v. Kessler*, 898 A.2d 290, 311 (Del. Ch. 2006) (noting that "the overriding consideration" in an entire fairness analysis "is whether the substantive terms of the transaction were fair").

[107] *See* Defs.' Opening Br. 15-18; Def.'s Reply Br. 10-14.

[108] Pl.'s Answering Br. 23.

[109] Compl. ¶ 5; *see also* Pl.'s Answering Br. 24.

Second, the plaintiff points out that the Transaction is lucrative to FNF because it carries significant annual dividends and an advantageous conversion rate.[110] These terms are unfair to F&G, it avers, because they involve "unnecessary payouts [of dividends] and dilution" when the preferred stock converts into common stock.[111] But the plaintiff ignores what F&G received in exchange. FNF paid $250 million to F&G at a premium of more than 17.5% per share to the then-existing market price.[112]

Third, the plaintiff questions the 6.875% dividend rate, 17.5% conversion rate, and $45.00 reference price.[113] Its reproach is uncontextualized; the plaintiff never identifies what about those terms is problematic. Nor does it offer any well-pleaded facts that F&G could have obtained more favorable terms on a mandatory convertible preferred stock transaction from a third party or in the open market.[114]

---

[110] Compl. ¶¶ 63-64 (alleging that FNF will receive over $51 million in dividend payments and between 4,728,000 and 5,555,500 additional common shares upon conversion); *see* Pl.'s Answering Br. 24.

[111] Pl.'s Answering Br. 24.

[112] The market price on January 11, 2024—the day F&G approved the transaction—was $41.41. Yahoo! Finance, F&G Annuities & Life, Inc. (FG), https://finance.yahoo.com/quote/FG/history/?period1=1701388800&period2=1705017600 (last visited May 7, 2025). Meanwhile, the preferred stock issued in the transaction converts to common stock at a price of $52.88 ($45.00 x 1.175). *See supra* note 27 and accompanying text (explaining the mechanics of the conversion premium).

[113] *See* Pl.'s Answering Br. 24; Compl. ¶¶ 63-64.

[114] The only comparable transaction in the pleading-stage record is a preferred stock transaction involving Apollo Global Management in August 2023. Barclays reported to the Special Committee during its December 15 meeting that FNF's financial advisor had

21

Fourth, the plaintiff asserts that F&G should have pursued a debt transaction or relied on other parts of its capital structure for funding. It alleges that because F&G had $300 million available under an unsecured revolving credit agreement and $200 million in a line of credit, it "could have simply drawn down on these facilities instead of issuing FNF the [p]referred [s]tock."[115] The plaintiff further notes that in May 2024—two months after the Transaction closed—F&G priced a $500 senior notes public offering at a 6.5% coupon rate due in 2029, $250 million of which was intended to pay back other notes.[116] Because the coupon rate is nominally lower than the Transaction's dividend rate, the plaintiff maintains that "F&G had less expensive capital raising options available to it than the [Transaction]."[117]

These uneven comparisons of debt and equity cannot logically support an inference of unfairness. Debt is not preferred stock. They are distinct financial instruments with different terms, structures, benefits, and drawbacks.[118] The

---

referenced the Apollo pricing terms—a 6.75% dividend rate and a 20% conversion premium. *See* Dec. 15 Special Committee Minutes '203. FNF's financial advisor reasoned that due to F&G's smaller size, the decreased liquidity in F&G's common stock, and differences in fundamentals between F&G and Apollo, the transaction with FNF would likely have a higher dividend rate and/or a lower conversion premium. *Id.* That is precisely what the final Transaction reflects.

[115] Compl. ¶ 70.

[116] *Id.* ¶ 71.

[117] *Id.* (comparing the 6.5% coupon rate on the debt offering to the 6.875% dividend rate on preferred stock in the Transaction).

[118] *See, e.g.*, *SV Inv. P'rs, LLC v. ThoughtWorks, Inc.*, 7 A.3d 973, 991 (Del. Ch. 2010) (noting that, "in lieu of preferred stock, investors can purchase convertible debt or straight

availability of debt on certain terms does not make an earlier preferred stock issuance unfair.[119]

At bottom, the plaintiff's claim rests on conclusory allegations of unfair price. It does not say which of the Transaction's terms—dividend rate, conversion premium, reference price, etc.—were inequitable or why. Nor does it allege that the terms compare unfavorably to a preferred stock offering in the public markets. The Special Committee materials incorporated into the Complaint reflect the opposite.[120] The plaintiff only speculates that a pure debt or equity offering might have been available to F&G.[121]

Delaware courts will not accept such bare allegations of unfairness. *Monroe County Employees' Retirement System v. Carlson* is instructive.[122] There, a plaintiff alleged that intercompany agreements were "substantively unfair" because the company paid large sums to the controlling stockholder in exchange for services.[123]

---

debt with warrant coverage," which "carries the downside protection of a debt instrument's right to payment at a specified time, irrespective of the company's financial condition"); *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *12 & n.4 (Del. Ch. Apr. 14, 2017), *as corrected* (Apr. 25, 2017) ("Delaware courts have held consistently that preferred stock is equity, not debt.").

[119] *See* Defs.' Opening Br. 18 (describing the plaintiff's comparison of debt and equity as "apples-to-oranges"); Def.'s Reply Br. 12 (same).

[120] *See supra* notes 33-34, 39-40, 45, and accompanying text.

[121] *See* Pl.'s Answering Br. 15.

[122] 2010 WL 2376890.

[123] *Id.* at *2.

23

Chancellor Chandler rejected the plaintiff's conclusory statement of unfairness as deficient because it lacked "factual allegations demonstrating *why* [the transactions] were unfair."[124] He observed that the plaintiff failed to plead facts that "put [the payments] into perspective," such as by showing that the company "could obtain services at a better price elsewhere," or explaining "what [the controlling stockholder's] services [we]re worth relative to the price [the company] paid."[125] "Thus, even if plaintiff's factual allegations prove[d] unfair dealing, the complaint posit[ed] no basis for concluding that the [conflicted] transactions were priced unfairly."[126] The breach of fiduciary duty claims were consequently dismissed.

Here, the absence of specific allegations about the substantive unfairness of the Transaction compels the same result as in *Monroe*. The plaintiff has not shown "some facts" that, if true, would make the Transaction terms unfair.[127] It has therefore failed to state a reasonably conceivable claim for breach of fiduciary duty.

## III. CONCLUSION

The plaintiff has failed to state a claim upon which relief can be granted against FNF. Because that is the sole remaining claim, the Complaint is dismissed with prejudice.

---

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] *Solomon*, 1995 WL 250374, at *6.